# GEORGE M. BAEHR

*vs.*

# STATE OF MARYLAND.

*Prosecution for Bastardy—Evidence—Intercourse With Other Men—Declarations.*

In a prosecution for bastardy, it may be shown by competent evidence that the mother had sexual intercourse with other men at about the time the child was begotten.                    p. 134

In a prosecution for bastardy, declarations, not under oath, by a third person, that he had intercourse with the prosecutrix at about the time the child was begotten, were properly excluded as hearsay.                    p. 135

Act 1912, Chapter 163 (Code, Vol. 3, Art. 12), in reference to bastardy proceedings before a justice of the peace, does not provide for the taking of the testimony of a witness other than the prosecutrix, and consequently it must affirmatively appear that a third person did testify in such proceeding in order to render his declaration that he had intercourse with prosecutrix admissible as having been made under oath at that time.  p. 134

*Decided February 18th, 1920.*

Appeal from the Criminal Court of Baltimore City (DAW-KINS, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*Frank Driscoll* and *William H. Lawrence,* for the appellant.

*Alexander Armstrong, Attorney General,* with whom were *Wm. Pinkney White, Jr., Assistant Attorney General,* and *Horton A. Smith, Deputy State's Attorney for Baltimore City,* on the brief, for the State.

THOMAS, J., delivered the opinion of the Court.

The appellant was indicted and convicted in the Criminal Court of Baltimore of bastardy. The indictment charged that the child was begotten on the 13th of February, 1918, and that it was born on the 1st of October, 1918. The case was tried before the Court without a jury on the plea of not guilty, and this appeal brings up for review the rulings of the Court below on the evidence embraced in five bills of exception.

The indictment was found on the 25th of November, 1918, and it appears from statements of counsel in the record that the trial was postponed several times to enable the traverser to secure the attendance of Harry DeMoss as a witness for the defense. The case was finally tried on the 19th of February, 1919, without this witness, and, as will be shown in our discussion of the evidence, several of the exceptions grew out of repeated efforts of counsel for the traverser to introduce in evidence the declarations of DeMoss to the effect that he had sexual intercourse with the prosecuting witness about the time the child is alleged to have been begotten.

The prosecuting witness testified that she became acquainted with the traverser about the 1st of February, 1918, and was introduced to him by her cousin; that the first time she had sexual intercourse with him was on the 13th of February, 1918, at the boarding house of Mrs. Small, on Light Street; that she did not discover that she was pregnant until March; that the child, a boy, was born on the 1st of October, 1918, and that the traverser was his father; that at the time the baby was born she was sick with the "Spanish influenza," and that her doctor told her that the baby was "a seven months and two weeks' baby." On cross-examination she testified as follows: "Q. Miss Brown, are you sure that this took place at Mrs. Small's house? A. Yes, sir; I am positive. Q. When did he first have intercourse with you? A. On the 13th of February. Q. Where were you on the 13th of Feb-

ruary? A. At Mrs. Small's house. Q. Were you any other place on the 13th of February? A. No, sir. Q. Now, you heard, at the station house, the testimony of Mr. DeMoss that he had had intercourse with you around that time? A. No, sir. (Mr. Smith): Wait a minute, I object. (The Court): Object to what? (Mr. Smith): To what DeMoss said at the station house. (The Court): I think the objection ought to be sustained." The first exception is to this ruling.

The witness was then asked by counsel for the State if the traverser ever said anything to her mother in her presence, and she said that her mother found it out and went to him and asked him if he realized that he "had me in trouble," and that he said "Yes"; that her mother asked him what he intended to do about it, and he said, "I intend to marry her"; that her mother said, "What is your reason for not marrying her now?" and that he said that his father intended to get him a position in the navy as first class yeoman, and that as soon as his father got him the position he would marry "me," and that on the day they expected to be married, on Saturday, June 8th, he came to her house and told her mother that he wanted to change his mind. On re-cross-examination she testified as follows: "Q. When was that Thursday night? A. It was in June. Q. What time in June? A. It was the 7th —it was on the 8th, on a Thursday. Q. Now, at the station house, didn't the magistrate then ask Mr. Baehr (the traverser) if he would marry you and Mr. Baehr said 'No,' didn't he? A. Yes, sir. Q. What reason did he give then? (Mr. Smith): Objected to. (The Court): I think we ought to hear that. Q. What reason did he give at the station house? (Mr. Smith): Objected to. Mr. Driscoll (counsel for the traverser) is trying to get in a statement made by Baehr which is pure hearsay, something told to him. The offer is to prove that he said that DeMoss had had something to do with the girl and I object to it. (The Court): I think if that is the purpose of it, it should be sustained. He can make his statement in regard to that." After discussion by

counsel, the Court said: "I sustain the objection," and the second exception is to the refusal of the Court to allow the question to be answered.

Mrs. Brown, the mother of the prosecuting witness, testified that when she heard of her daughter's condition, she went to the traverser and asked him if he realized that he had her daughter in trouble, and that he said "Yes"; that she asked him what he was going to do about it, and that he said he was going to marry her; that she said to him, "What are you waiting for?" and that he said his father was going to get him a position in the navy, and that he did not want him to know about it until he got the position; that she gave him until the last of the week to get the position, and that on Saturday, when her daughter was getting ready to be married, he came to her house about nine o'clock in the morning, and that when she took him into the parlor he said, "Mrs. Brown, I have changed my mind, I am not going to marry May"; that she asked him his reason, and that he said to her, "it was another fellow implicated in it," and that she then told him that the only thing her daughter could do with him was to go down to the station house with him.

The traverser testified that he first met the prosecuting witness on the 15th of February, 1918, at a ball at Hazazer's Hall; that he was introduced to her by her cousin; that he took her home from the ball, and had intercourse with her at her house that night. He was then asked by his counsel if he knew of anybody else who had had intercourse with her, and when an objection to the question was sustained, he was asked the following question: "Q. Did you hear any one say that he had intercourse with May Brown between the fifteenth of February and first of March, in May Brown's presence?" and the third exception is to the refusal of the Court below to permit the question to be answered.

The traverser further testified that he made an effort to locate DeMoss, but had been unable to do so; that he and the prosecuting witness were at a party together about two

weeks after the 15th of February; that when he started to
take her home, she went into the hall and said she was going
upstairs to get her coat; that after waiting for her for some
time he attempted to go into the hall to call her, but found
that his way was blocked by a man named Flynn, who said
that some one wanted him in the kitchen; that when he went
in the kitchen he found that no one was in there; that he
thought it was very funny, but that he took her home.   He
then said, "After that, though, through a conversation I over-
heard DeMoss and a couple of more fellows talking about it
and"——   At that point counsel for the State objected, and
the Court said: "Tell what Miss Brown said:" The traverser
then said: "She said, she told me after I told her about it.
I asked her about it and she claimed that DeMoss had did
it to her.   She claimed that DeMoss had forced her to do it,
and DeMoss claims"——   At this point the State again ob-
jected, and the Court sustained the objection, and granted
a motion to strike out the testimony, which ruling is the
subject of the fourth exception.

The traverser was then asked by his counsel to simply tell
what Miss Brown told him, "but not what DeMoss said,"
and he said that she told him that DeMoss had had inter-
course with her on the steps while Flynn was in the hall.
He further testified as follows: "Q. Now, did you ever prom-
ise at any time to marry May Brown?   A. Not that I can
recall.   (Mr. Smith): That answer ought to be yes or no.
(Witness): No, sir.   Q. When did she first say anything
to you about being pregnant?   A. About a month and a half
after I met her.   Q. Now, did she ask you at that time
whether you were going to marry her?   A. She didn't say
anything in regard to marriage.   She just told me she was
in that way and she would like to know a way to get out of
it.   She looked for me to get her out of it, but I was not
going to do anything about it, because I had found out about
the others.   (Mr. Smith): I move to strike out that observa-
tion of the witness.   (The Court): I think so.   Granted."

The fifth exception is stated to be to the "action of the Court in sustaining objection, and striking out the testimony." The traverser further testified that he never told Mrs. Brown that he would marry the prosecuting witness, and that on the Saturday morning referred to in Mrs. Brown's testimony he told Mrs. Brown in the presence of the prosecuting witness that he did not intend to marry her daughter because of her intercourse with DeMoss, and that her daughter had told him about it.

The third exception was abandoned in this Court, and while some of the exceptions do not show exactly what evidence was rejected by the Court, the case was tried before the Court, and we think it reasonably clear that the only evidence intended to be excluded was the evidence of declarations of DeMoss or others tending to show that DeMoss had connections with the prosecuting witness between the fifteenth of February and first of March. For instance, in the second exception, after the prosecuting witness testified that the traverser said "No" when asked at the station house if he would marry her, she was asked what reason he then gave for refusing to marry her, and when the State objected to the question, the Court first said the evidence should be admitted, but when the State pointed out that the question was only an effort on the part of the traverser to introduce hearsay evidence, and after discussion by counsel, which no doubt indicated the purpose of the question, the Court sustained the objection. Again in the fourth exception, the answer of the traverser was not objected to until he attempted to add to his statement of what occurred at the party he attended with the prosecuting witness what he heard in a conversation between DeMoss and others, and the Court evidently did not intend to strike out that part of the testimony of the witness which related to what he saw, or what the prosecuting witness told him, for immediately after the ruling of the Court the witness was told by his counsel to confine himself to what the prosecuting witness said, and not what DeMoss said. The

same may be said in reference to the fifth exception. The only evidence objected to there, and intended to be excluded, was the reference of the witness to what he "found out about the others." Moreover, the traverser got the benefit of his own testimony that the prosecuting witness admitted to him that she had had sexual intercourse with DeMoss about two weeks after the fifteenth of February, and also of the testimony of Mrs. Brown that he told her that his reason for not marrying the prosecuting witness was that "another fellow was implicated."

It is said in 3 *R. C. L.* sec. 44, p. 763: "Evidence is admissible to show that the mother had sexual intercourse with other men at about the time the child was begotten, and the mother may be interrogated on this point, but evidence tending to show that she had illicit connection with other men, and interrogatories made with a view to elicit that fact from her must be confined to a period when in the course of nature it would have been possible for the child to be the result of such intercourse." This rule has been fully recognized and adopted by this Court. *Jones* v. *State,* 132 Md. 142; *Seibert* v. *State,* 133 Md. 309. But the fact of such illicit connection within the period allowed must be proved like any other pertinent fact by competent evidence, and it is said in 5 *Cyc.* 662: "Declarations of a third person admitting his paternity of the child are inadmissible on behalf of the defendant." It is said in an extensive note in 37 *L. R. A.* (N. S.) 346, "that evidence of the confession or admission of a stranger that he is the perpetrator of the offense is not admissible as a matter of substantive evidence for the purpose of exculpating the accused, where it is made neither under oath, subject to cross-examination, nor as part of what is indiscriminately denominated the *res gestae.*" The Act of 1912, Ch. 163 (Vol. 3, Art. 12 of the Code), does not provide for the taking of the testimony of any witness other than the prosecuting witness at the hearing before the justice of the peace, and there is no evidence in the record to show that at

the hearing before the justice of the peace in this case DeMoss testified under oath, as suggested in the question in the first bill of exception, and hence the evidence objected to could not be said to be within the exception to the rule stated in 37 *L. R. A.* (N. S.) *supra*. It is said in the syllabus of the case of *Benton* v. *Starr,* 58 Conn. 285, 20 Atl. 450: "In a prosecution for bastardy, evidence is not admissible for the accused, of declarations by another that he was himself the father of the child, though they were made so soon after the conception as to make it probable that the woman's condition was known to no one but herself and the man concerned in the transaction." But whatever may be the rule elsewhere, we think the question of the admissibility of such declarations is disposed of in the case of *Munshower* v. *State,* 55 Md. 11. In that case JUDGE MILLER, after stating that counsel for the prisoner "admit that on a trial for murder the admissions or declarations of third persons that they killed the deceased are not evidence, but they insist that if such third persons, on being examined as witnesses, implicate the prisoner by their testimony, evidence of their declarations that they were guilty of the offense is admissible to discredit the witnesses," and after a very full discussion of the question, said: "To allow the introduction of such testimony would effect a dangerous innovation upon the law of evidence in criminal cases, and opens the door to the most fraudulent contrivances to procure the acquittal of parties accused of crime. We therefore entertain no doubt as to the correctness of the ruling in this exception."

The Court below very properly excluded the *declarations* of DeMoss or others that DeMoss had had sexual intercourse with the prosecuting witness, when attempted to be introduced in the cross examination of the prosecuting witness, or in the examination of the traverser, and finding no reversible error in any of the rulings complained of, the judgment must be affirmed.

*Judgment affirmed, with costs.*