RANDY JACOBS, LAWRENCE RUFUS JACKSON and ROBERT GALLOWAY A/K/A ROBERT LEWIS A/K/A ROBERT LEWIS JACKSON v. STATE OF MARYLAND

[No. 399, September Term, 1979.]

*Decided June 11, 1980.*

The cause was argued before MORTON, MOYLAN and WEANT, JJ.

*Thomas J. Saunders, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant Randy Jacobs. *Patrick D. Hanley, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant Robert Galloway. *Peter M. Levin, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant Lawrence Rufus Jackson.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Dale Kelberman, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

This appeal, in its most significant aspect, requires us to stand far back and observe some fundamental characteristics of the criminal justice system that are too easily lost sight of when we get in so close that we lose perspective. It requires an appreciation of the functional difference between the

common law of evidence and the constitutional law of evidence. It requires a sensitivity to the distinct traditions, purposes and rules of procedure surrounding those basically different limitations upon the fact-finding process. Macroscopic vision is sometimes as needed as microscopic vision. But first the backdrop:

On the evening of February 5, 1978, Robert Lashley was murdered by four gunshot wounds to the head and one to the neck, two of the shots at point-blank, contact range. A Baltimore City jury, presided over by Judge David Ross, convicted all three appellants, Randy Jacobs, Lawrence Rufus Jackson and Robert Lewis (a/k/a Robert Galloway and Robert Lewis Jackson) of murder (Jacobs and Lewis of first-degree murder and Jackson, by way of obvious compromise, of second-degree murder) and related handgun charges. Their respective appellate contentions diverge as widely as did their trial tactics.

### Legal Sufficiency of the Evidence

### (As to Appellant Jackson Only)

Lawrence Rufus Jackson alone challenges the legal sufficiency of the evidence, claiming that Judge Ross erred in ruling that there was enough proof to go to the jury on the issues of murder in the second degree and the use of a handgun to perpetrate a crime of violence. In this regard, Jackson does not contest the adequacy of the proof to establish the *corpus delicti* of the two crimes. He challenges only the sufficiency of the evidence to establish his own criminal agency in those crimes. His challenge is without merit but will serve to place the contentions that follow in factual context.

Curtis Carter, a close friend of the murder victim, received via telephone ongoing "spot reports" on the progress of the murderous evening. He knew both the appellant Jackson and the appellant Lewis and knew, as well, that they were both acquainted with the victim Lashley. All of the actors in this case were homosexual acquaintances of each other. Both

appellants Jackson and Lewis as well as Lashley had been together on one occasion in Carter's home within a week prior to the murder. On the evening of the murder, the victim Lashley was expecting an imminent visit from the appellant Jackson, and he communicated that expectation to Carter. The first call came from Lashley to Carter relatively early in the evening (the times of the various calls were established with less than pinpoint precision) wherein Lashley informed Carter that Lashley expected the appellant Jackson to "pay him a visit that night." While the conversation was in progress, Carter overheard a knock at Lashley's door and heard Lashley say, "Oh, hi, Robert." Carter then had a brief conversation with the appellant Lewis, whose voice he recognized. Lewis then hung up the phone. This occurred at some point between 8:30 and 10:00 p.m.

Approximately 20 minutes later, the victim Lashley called Carter back. Lashley indicated to Carter that he, Lashley, had taken Lewis and Jackson to the bus stop. He indicated further that he was angry at the appellant Jackson for having brought his brother (the appellant Lewis) along on this visit. The conversation concluded with Lashley saying, "I don't feel like talking. I guess I'll talk to you later."

Carter, in the meantime, was also in telephone contact with Ronald Whitfield, a mutual friend of Carter and the victim Lashley, keeping Whitfield apprised of his growing sense of dread. At one point, following Carter's second telephone conversation with Lashley, Whitfield called Lashley and determined that all was well. Whitfield communicated that reassurance to Carter, but Carter was not reassured. Carter called Lashley again. A voice answered which Carter recognized to be that of the appellant Lewis. The answer, however, was to the effect that Carter had the wrong number, and the phone was then hung up at Lashley's end. Carter immediately called back. The appellant Lewis again picked up the phone but this time identified himself. The appellant Lewis told Carter that Lashley and the appellant Jackson had gone out to get some beer. Carter heard background noises similar to those made

when furniture is being moved. Following this conversation, Carter telephoned the police and asked them to check out Lashley's apartment. The call to the police was made at approximately 11:40 p.m.

In the meantime, one David Bavis, a neighbor of Lashley's, heard the sound on Lashley's television set or stereo suddenly turned up very loud at approximately 11 p.m. Bavis interpreted this as a signal from Lashley to stop the band rehearsal which Bavis had been conducting in his own apartment. Bavis testified further that some five to ten minutes later, he heard a thumping noise come from Lashley's apartment, along with noises which he interpreted as emanating from a fight.

In response to Carter's call, Officer Charles Scharmann of the Baltimore City Police Department responded to check out Lashley's apartment at 11:42 p.m. On the parking lot outside, he found the appellant Jackson and the appellant Jacobs cleaning snow off an automobile registered to the victim Lashley. Although the two appellants were cooperative in other regards, the appellant Jacobs falsely identified himself as one Michael Jones. Officer Scharmann observed a Philco television set sitting on the back seat of the automobile. Both appellant Jackson and appellant Jacobs explained to the officer that Lashley had already left the area and that they, at the request of Lashley and as an accomodation to him, were delivering his automobile and the television set to Carter's apartment. Officer Scharmann insisted that the two accompany him to Lashley's apartment. The officer knocked on the door several times but received no response. He inquired of neighbors as to whether they had heard or seen anything unusual and learned that they had not. Solicitous of the murder victim's Fourth Amendment rights, the officer did not enter the apartment. He left the scene, and the appellants Jacobs and Jackson were free to go.

While Officer Scharmann had the appellant Jackson and the appellant Jacobs "in tow," two of Lashley's neighbors made significant observations to which they testified in court. Deborah Sammons observed that after the officer and

these two appellants entered the apartment building, a third man crawled out from underneath a car parked beside the one from which the two appellants had been cleaning snow. Another neighbor, Marie Carter (no apparent relationship to Curtis Carter) testified that she saw one of the individuals who entered the building with the police officer later come outside, walk down to the corner of the building, stand there a second and then go back into the building. The next day, Marie Carter's husband, John Carter, found the victim Robert Lashley's wallet on the ground at the spot where his wife had noticed this man standing on the night before.

Shortly after this police visit, Curtis Carter received two interesting phone calls from the appellant Jackson. In the first, Jackson informed Carter that Jackson was calling from Jackson's home. Jackson then said, "Curtis, I don't know what's wrong with your buddy, he took me to the No. 5 busline and he act as though he wanted Robert Galloway to go back to his house." Carter, skeptical as to whether the call had been placed from Jackson's home, then called Jackson at home. A young man answered. Carter asked to speak to Jackson but was unable to make contact. Approximately ten minutes later, Jackson called Carter again, this time saying, "Curtis, if anything happens to your buddy, I don't want you to think I had anything to do with it." [1] Carter inquired of Jackson as to why Jackson would say something like that. Jackson replied, "Because he gave me the keys to his car and told me to take his television in the car." Carter asked Jackson what Jackson was supposed to do with the car keys and the television, and Jackson replied that he did not know.

Just before receiving these two calls from Jackson, Carter had called his friend Whitfield and the two determined to go and make their own investigation of Lashley's apartment. En route, they stopped and informed a police officer of their concern. When they arrived at the apartment, Carter found the door unlocked and Lashley's body lying in a pool of blood. His television set was missing, and his bedroom appeared to have been ransacked. The phone rang. Carter picked it up

---

1. *Qui s'excuse, s'accuse.*

640

and heard the appellant Jackson's voice on the other end. Carter hung up without responding. He immediately had a neighbor call the police, who arrived at Lashley's apartment at 1:43 a.m. There were no signs of a forced entry.

A lookout was immediately broadcast for Lashley's car and for the three appellants. At approximately 3:10 a.m., Lashley's automobile was found in the 500 block of W. Lafayette Avenue, within a block of the homes of all three appellants. All three appellants were shortly thereafter found in the same area where the car was found and were placed under arrest.

A crime laboratory technician, at 3:52 a.m., performed a leucomalachite test on the hands of the appellants and found the probable presence of blood on the hands of the appellant Jackson and the appellant Lewis.

It is simply to state a self-evident truth to hold that this massive web of circumstantial evidence is legally sufficient to have permitted the jury reasonably to infer the involvement of the appellant Jackson in the murder and that Judge Ross, therefore, did not commit error in permitting the case to go to the jury. *Williams v. State,* 5 Md. App. 450, 459, 247 A.2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A.2d 331.

## Leading Questions

### (As to Appellant Jackson Only)

Before proceeding to the significant legal issues raised on this appeal, we may dispose of summarily the other two contentions raised by the appellant Jackson.

He claims that Judge Ross committed error in permitting the State to ask leading questions of its witness Curtis Carter. He fails to lay any predicate whatsoever for this contention, however. He fails to direct our attention to a single instance of an arguably leading question, let alone to an instance where timely objection was made and the objection was overruled. We have no way of knowing what rulings of the trial judge the appellant Jackson questions or,

indeed, whether there were any rulings sought and made in this regard. There is obviously nothing preserved for review. Maryland Rule 1085.

### Admissibility of Tape Recording of Telephone Call

### (As to Appellant Jackson Only)

It is difficult to fathom the appellant Jackson's point in this regard except as an understandable desperation effort by a convicted defendant to grasp at any straw, no matter how frail and insignificant it may be.

The State's witnesses Curtis Carter and Ronald Whitfield were unable to pinpoint the precise times when events occurred on the evening and early morning of February 5-6, although they were able to establish the sequence of those events. The telephone calls they made to the Baltimore City Police Department, however, were taped and were logged in with precise timing. Tape recordings of those calls were played to the jury both to establish the times when they were made and to corroborate the testimony of Whitfield and Carter as to having made the calls. The appellant Jackson does not take issue with the playing of those tapes of those calls. He does take issue with the playing of one additional tape recording of one additional telephone call made to the police by a neighbor who called in to report that someone had been killed. The appellant Jackson's complaint is that this "was hearsay and served no necessary purpose." In holding against the appellant Jackson on this issue, our response is twofold: 1) How do we know it was hearsay? and 2) What difference does it make?

The court reporter did not transcribe the tape-recorded conversation of the telephone call as the tape was played to the jury. The tape itself was, to be sure, introduced in evidence. No transcript of it has been made, however, and included in this record. The burden in this regard is clearly upon the appellant. Maryland Rule 1026 (c) (2); *White v. State,* 8 Md. App. 51, 54, 258 A.2d 50; *Van Meter v. State,* 30 Md. App. 406, 410, 352 A.2d 850. In view of this failure

of the appellant to perfect the record, we have no way of knowing whether the telephone call in question contained an out-of-court assertion offered in court for the proof of the thing asserted or not.

Although this is totally dispositive of the contention, we cannot help but note its frivolous nature even if a perfected record were here to establish everything the appellant Jackson seeks to establish. In view of the undisputed testimony by Curtis Carter and by the investigating officers that the victim's lifeless body was found in his apartment and in view of the indisputable testimony of the medical examiner that four bullets were taken from the victim's brain, the out-of-court declaration, even be it hearsay, to the effect that "someone had been killed" is as harmlessly redundant as anything could ever be. The appellant himself argues that this hearsay "served no necessary purpose." Where then was any arguable prejudice?

### Declarations Against Penal Interest Made to a Private Person

#### (Appellants Lewis and Jacobs)

There is a curious "reverse English" to this case. The appellants Lewis and Jacobs vehemently challenge the introduction of two declarations against penal interest made by them to a private person and offered at the trial by their codefendant Jackson. The declarations were mutually consistent and served to inculpate Lewis and Jacobs but to exculpate Jackson. It was Jackson who offered them as part of his defense. Although the ultimate admissibility of the declarations would not have been affected if the State had offered them, the twist in this case is that the State did not. Indeed, the State objected to the introduction of these declarations. The State's tactical situation was such that it deemed the declarations redundant for purposes of further inculpating Lewis and Jacobs, but was fearful of the declarations because of their potentially exculpating influence as to Jackson. On balance, the State simply did not want these declarations against interest to go to the jury.

As we approach this central issue of the case, we must observe that analysis would be so much cleaner if all parties could discuss such matters in the neutral language of algebra instead of in the frequently emotionally charged language of English. Although the declarations in issue are full acknowledgments of guilt, they are "declarations against penal interest" and not "confessions." The very word "confession" carries too much highly charged connotative baggage, with its images of police interrogation, of third-degree sessions under naked lightbulbs, of question and answer formats, of *Miranda* and its progeny, of the right to counsel, and of the privilege against compelled self-incrimination. The fact that the declarations here were reduced to writing instead of being of a more informal, oral character is beside the point. The fact that the writings resemble, in terms of the arrangement of the text upon the page, the more familiar police "confession" is beside the point. The fact that the declarations were notarized is beside the point. The fact that the declarations were made within prison bars rather than without prison bars is beside the point. Had the same events occurred with all three codefendants out on bail, the legal posture would not be otherwise.

As a recognized exception to the rule against hearsay, the declaration against interest is admissible if the trial judge deems it trustworthy.[2] This is true whether the forum is civil or criminal; whether the declaration is offered by a plaintiff, a civil defendant, the State or a criminal defendant; whether it is offered for inculpatory or exculpatory purposes. If it is trustworthy, it comes in for all purposes; if it is not trustworthy, it may not come in for any purpose. The trial judge rules upon the question of admissibility. The fact

---

2. The trustworthiness in issue in this regard is the trustworthiness of the declaration, assuming it to have been made and to have been made in the form recounted from the witness stand. The trustworthiness of the witness who serves as the mere conduit for the out-of-court declaration is, on the other hand, tested by other devices such as the oath and cross-examination at the trial itself. All too frequently, we allow our distrust of the witness on the stand to be transmuted into a mistrust of the out-of-court declaration, and this frequently subconscious transfer serves only to blur analysis.

644

finder gives such weight to it as he thinks appropriate in precisely the same way that he weighs all other types of evidence.

The indispensable major premise undergirding the defense argument in this regard is that the rules and procedures controlling the admissibility of a declaration (of any sort) made to a private person are precisely the same as those controlling the admissibility of a confession made to a police investigator. Nothing could be farther from the truth, but an appreciation of the vast difference between the two phenomena requires us to back far off and to view the whole criminal justice system in historic perspective before renarrowing the focus to the precise issue at hand. We need to approach the problem with a keen sense of the difference between the common law of evidence and the constitutional law of evidence.

From the earliest beginnings of human society, as people bound themselves together under a variety of social contracts, they promulgated rules of behavior for the group and they provided for the enforcement of those rules. Whenever the tenets of acceptable behavior were transgressed, men bound themselves together as a *posse comitatus* — first as families, then as clans, then as tribes, then as nation-states — and demanded an answer to the question, "WHODUNIT?: Who killed the boy?, Who stole the pig?, Who burned the cottage?" Once the transgressor had been identified, a variety of sanctions might be imposed. As this process manifested itself in Anglo-American common law, we early surrounded the process with safeguards to insure that we were "Getting the Right Man."

The service of this goal is the quintessential function of the common law of evidence. In essence, evidentiary law is a set of sieves and devices that pass through to the fact finder data that is competent, relevant and material but screen out all data that is incompetent, irrelevant and immaterial. The common law of evidence is interested fundamentally in the integrity of the fact-finding process. We keep out all that might obscure the truth; we allow in all that will further the search for truth. The prime concern is the trustworthiness,

the reliability, the accuracy of the process by which we seek the answer to the ultimate riddle of Whodunit.

In the American quadrant of Anglo-America, we have in recent decades superimposed a second limiting condition on the process. Aware of the awesome power of the State, acting in our collective name, to investigate and to prosecute those who break our laws, we seek additional safeguards to insure not simply that we are "Getting The Right Man," but also that the State is doing it "By The Marquis Of Queensberry Rules." The service of this additional goal is the quintessential function of the constitutional law of evidence. Just as the body of a constitution sets out what government may do, a bill of rights sets out those things that government may not do. The exclusionary rule implements these limitations on governmental behavior. The prime concern is the fairness of the process by which we seek the answer to the ultimate riddle of Whodunit.

Thus, we circumscribe the process of identifying outlaws by two basic limiting conditions:

1) Getting The Right Man.

2) By The Marquis Of Queensberry Rules.

The first condition concerns the accuracy of the answer. The second condition concerns the fundamental fairness and decency of governmental conduct in obtaining the proof of the answer. The bitter irony is that the two purposes do not always dovetail; sometimes they are in opposition. This is why the exclusionary rule is described by Wigmore and McCormick and others as serving the purpose of an "extrinsic policy." We deny the fact finder probative evidence that would enhance the literal, objective search for truth to express disapproval of the means by which government obtained that evidence. We deliberately diminish the accuracy of the process in order to enhance the fairness of the process. The very existence of this second limiting condition is aimed at governmental behavior alone. The Bill of Rights and the Fourteenth Amendment, by express terms, regulate the behavior of government and not

of private persons. The attendant rules of procedure that have grown up in this context — special burdens allocated to the State, etc. — are applicable to the regulation of governmental behavior via the constitutional law but do not regulate private behavior. With respect to evidence procured by private persons, we ask the questions that are the concern of the common law of evidence — Is it competent?, Is it trustworthy?, Will it enhance the accuracy of the verdict?

In the case at bar, the State completed its case against all three defendants without offering any inculpatory statements made by any of them. The State rested, and motions for judgments of acquittal were made and denied. It was only then, in the course of defense testimony, that the appellant Jackson called to the stand one Harry Anthony Conyers, a social worker assistant at the Baltimore City Jail and, more significantly for present purposes, a notary public. Through Conyers, there were introduced four statements, two of them declarations against penal interest made by the appellants Lewis and Jacobs on February 16, 1978, and two of them declarations against penal interest made by the same two appellants on March 14, 1978. The latter two really concern us here. In both sets of statements, the versions of the crime given by the two confessing appellants are consistent with each other. In both sets of statements, they take full responsibility themselves and exculpate totally the appellant Jackson. The key difference between the two sets of statements is that in the first set, both appellants confessed to having beaten the victim to death. In the second set, they both confessed to having shot him. According to Mr. Conyers, the statements had been typed in advance but were signed in his presence. They were, furthermore, made under the following oath:

> "Do you solemnly swear and affirm in the presence of Almighty God that the statements made in this motion are true to the best of your knowledge?"

Judge Ross found against the appellants Lewis and Jacobs on the question of authentication and also on the question of whether these statements violated a lawyer-client privilege.

They had been made apparently at the request of Roland Walker, Esquire, attorney for the appellant Jackson. No issue is being taken with respect to these rulings by Judge Ross.

Judge Ross further found, under the common law of evidence governing exceptions to the rule against hearsay, that these declarations met the criteria of admissibility as declarations against penal interest. Under the common law of evidence, the three critical questions for admissibility of any evidence are: 1) Is it material?, 2) Is it relevant? and 3) Is it competent? In a trial of three defendants for murder, the issue of who committed the murder is quintessentially material. Declarations by two of the accused defendants implicating themselves and exculpating their codefendant are quintessentially relevant on the issue of who committed the murder. The only question remaining to be asked is: Are the declarations competent evidence? — Are they worthy of belief and, therefore, likely to enhance the ultimate accuracy of the fact finding?

A declaration against penal interest is now recognized as competent upon the theory that the statement against interest is a sufficient guarantee of trustworthiness. Although Maryland earlier followed the common law tradition according to the *Sussex Peerage* case, 11 Cl. & F. 85, 8 Eng. Rep. 1034 (1844),[3] that a declaration against

---

3. The monumental joke — that has haunted us for 150 years — is that the *Sussex Peerage* case was ever taken seriously by anyone — taken seriously for precedential purposes, that is. The pre-existing law on declarations against interest had never subdivided interests into the pecuniary variety versus the penal variety. The strange notion that a man might cavalierly risk the gallows for a friend but would never risk financial loss for that friend had never occurred to anyone. If ever a hard case was blatantly result-oriented in making bad law, it was *Sussex Peerage.*

Young Victoria was but six years into her reign. Her favorite uncle — Augustus Frederick, the 70-year-old Duke of Sussex — had died in June, 1843, apparently without legitimate heir. The dukedom, with numerous lands and manors and an income of £21,000 per annum plus a seat in the House of Lords, would normally have reverted to the Crown. There suddenly appeared, however, a claimant, Augustus D'Este, holding himself out to be the late Duke's legitimate son by a private marriage contracted between D'Este's mother and the Duke in Rome over 50 years before. Upon the advice of the Attorney General, the Queen referred the matter to the House of Lords. At issue before them were both the validity of the Royal Marriage Act of 1772 and the question of whether the Roman marriage ever in fact took place. D'Este was put to his proof.

penal interest was not admissible although a declaration against pecuniary interest was, it now has joined the modern trend holding that declarations against penal interest are admissible.

In V *Wigmore on Evidence* (Chadbourn Revision 1974), Section 1476, pp. 350-351, Dean Wigmore looked to the "arbitrary limitation" of the *Sussex Peerage* case:

"[A]cceptance was gained, after two decades, for the principle that *all declarations of facts against interest* (by deceased persons) were to be received. What is to be noted, then, is that from 1800 to about 1830 this was fully understood as the broad scope of the principle. It was thus stated without other qualifications; and frequent passages show the development of the principle to this point.

But in 1844, in a case in the House of Lords,

---

The Duke was dead; D'Este's mother was dead; all witnesses to the questioned marriage were dead; the Anglican clergyman who ostensibly performed the ceremony was dead — BUT, prior to his death, that clergyman had confided to his son that he had performed the wedding. D'Este offered this declaration through the mouth of the son. The Crown objected that the evidence was hearsay. D'Este responded that it was a declaration against interest in that the clergyman, by performing the marriage, would have violated the Royal Marriage Act of 1772 and subjected himself to its penal provisions. Ignoring precedents to the contrary (according to Wigmore) and giving the whole issue the most cursory of glosses, the Law Lords rejected the evidence by announcing for the first time a distinction between declarations against pecuniary interest, which are trustworthy, and declarations against mere penal interest, which are not. Their lofty phrases lived on long after the stark reasons of state which had predictably compelled those lofty phrases were forgotten. More realistic is the appraisal of the trial in the *London Times* of May 25, 1844;

"Really the House of Peers must be gifted with incredible decorum; for our reporter does not note down a single instance of 'loud and continued laughter' from the beginning to the end of the trial. If this were in a comedy, it would be the making of Haymarket; if in a police report, London would be in fits the next morning. Dickens and Ainsworth are flat compared with it."

A century later, judges on five continents looked to the disembodied words of *Sussex Peerage* as if listening to the Oracle of Delphi, without the remotest recollection of the bizarre scenario in which those words were uttered. If one wonders whether royal judges, sitting in the House of Lords, might ever be tempted to bend a rule of evidence to achieve a desired result, it must be remembered that if Augustus D'Este had been declared to be the legitimate first cousin of the Queen, he would also have been, as of 1844, second in line to the throne itself.

not strongly argued and not considered by the judges in the light of the precedents, a backward step was taken and an arbitrary limit put upon the rule. It was held to exclude the statement of a fact subjecting the declarant to a *criminal liability,* and to be confined to statements of *facts against either pecuniary or proprietary interest.* Thenceforward this rule was accepted in England, although it was plainly a novelty at the time of its inception; for in several rulings up to that time statements of criminal facts had been received."

He went on to criticize the limitation in Section 1477, at pp. 358-359, referring to it as a "barbarous doctrine":

"It is plain enough that this limitation, besides being a fairly modern novelty of judicial invention, is inconsistent with the broad language originally employed in stating the reason and principle of the present exception . . . as well as with the settled principle upon which confessions are received . . . .

But, furthermore, it cannot be justified on grounds of policy. The only plausible reason of policy that has ever been advanced for such a limitation is the possibility of procuring fabricated testimony to such an admission if oral. This is the ancient rusty weapon that has always been brandished to oppose any reform in the rules of evidence, viz., the argument of danger of abuse. This would be a good argument against admitting any witnesses at all, for it is notorious that some witnesses will lie and that it is difficult to avoid being deceived by their lies."

In dissent in *Donnelly v. United States,* 228 U.S. 243, 277, 33 S. Ct. 449, 57 L. Ed. 820 (1913), Justice Holmes excoriated the *Sussex Peerage* limitation:

"[T]he exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder . . . ."

The Maryland commitment to *Sussex Peerage* was never firm. The first two cases cited for the tradition, *Munshower v. State,* 55 Md. 11 (1880), and *Baehr v. State,* 136 Md. 128, 110 A. 103 (1920), mention neither *Sussex Peerage* nor the declaration against penal interest doctrine. They simply hold, without discussion or citation of authority, that no error was committed when, in *Munshower,* defense counsel was not allowed to question a prosecution witness about a prior admission and, in *Baehr,* a bastardy defendant was not allowed to introduce a declaration by a third person that that third person was the father. In *Brennan v. State,* 151 Md. 265, 134 A. 148 (1926), *Sussex Peerage* is not mentioned, but the declaration against interest is briefly and generally discussed. *Brennan* begins, however, the cautious process of eroding away the general evidentiary prohibition "in very unusual cases." 151 Md. at 271.

The first true scholarly treatment of the doctrine in Maryland came from Judge Delaplaine in *Thomas v. State,* 186 Md. 446, 47 A.2d 43 (1943). He pointed out how *Sussex Peerage* had been a departure from pre-existing law, cited with approval the criticisms by Wigmore and by Holmes, pointed out the growing trend away from *Sussex Peerage* and characterized *Brennan v. State, supra,* as a case in which "the rule was assailed again in Maryland." 186 Md. at 451. The attack was *dicta,* however, for the holding in *Thomas,* reversing a conviction, was by way of distinguishing the rule. In *Brady v. State,* 226 Md. 422, 174 A.2d 167 (1961), Chief Judge Brune chipped away further at the *Sussex Peerage* rule, pointing out that the rule "has been severely criticized"; again citing the Wigmore and Holmes criticisms with approval; and cataloguing the various limitations on the rule, including *Brennan* and *Thomas.* In *Dyson v. State,* 238 Md. 398, 209 A.2d 609 (1965), Judge Hammond continued the erosion, pointing out that such declarations against penal interest are admissible where there is "no evidence of collusion" and where the declaration is "not on its face obviously untrustworthy." 238 Md. 408. See also *Wilkins v. State,* 11 Md. App. 113, 131-133, 273 A.2d 236 (1971).

At that point, the exceptions to the special limitation had swallowed up the limitation. We begin with the principle that declarations against interest are admissible as exceptions to the rule against hearsay. A limitation is placed on that principle, exempting declarations against penal interest from the admissible category. The latter-day exceptions to that limitation are that such declarations against penal interest will be admissible where there is "no evidence of collusion" and where the declaration is "not on its face obviously untrustworthy." This is the rule with respect to all declarations against interest, pecuniary or penal, if not indeed with respect to all proffered evidence of any variety. No judge, in the wise exercise of his discretion, would receive evidence where there is evidence of collusion or where the proffered evidence is on its face obviously untrustworthy. The special rule of evidence has thus remerged into the general rules of evidence.[4]

It but remained for Judge Morton to deliver the *coup de grace* in *Harris v. State,* 40 Md. App. 58, 62-63, 387 A.2d 1152:

> "Maryland is one of the so-called 'progressive' states that allows the admission of a declaration against penal interest, although some limitations have been placed thereon. In *Dyson v. State,* 238 Md. 398, 407 (1965), the Court of Appeals articulated the rule adhered to in this State:
>
>> 'Although Maryland formerly followed the general rule that a penal declaration against interest of a third party was not admissible evidence, the later cases have established that a confession by one other than the defendant,

---

4. Interestingly, no Maryland decision has ever overruled a trial verdict because a declaration against penal interest was received in evidence. The only reversals have come where such declarations were erroneously rejected. Interestingly as well, all of the Maryland cases deal with third-party confessions in criminal cases offered to exculpate the defendant on trial. This is not the critical factor, however, for the issue that matters in the common law of evidence is whether the proffered evidence is or is not worthy of belief, not the purpose or party which the proffered evidence is intended to serve.

that he committed the crime in question, should be received and considered by the trier of the guilt of the accused, unless it is clearly collusive, frivolous or otherwise obviously untrustworthy. *Brady v. State,* 226 Md. 422; *Thomas v. State,* 186 Md. 446; *Wiggins v. State,* 235 Md. 97, 103; *Brennan v. State,* 151 Md. 265; 23 Md. L. Rev. 178.' "

Although the Supreme Court of the United States had earlier adhered to the tradition of not recognizing the inherent trustworthiness of the declaration against penal interest, *Donnelly v. United States, supra,* (but see the Holmes dissent), it has now joined the modern trend by virtue of the new Federal Rules of Evidence, Rule 804. The rationale for admissibility was well articulated by the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 298-299, 93 S. Ct. 1038, 35 L. Ed. 2d 297, 311 (1973), a case in which the Supreme Court held that the declaration against penal interest there in question was not only permitted but was indeed compelled in terms of its admissibility:

"Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. ... A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest — an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made."

See also Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule,* 58 Harv. L. Rev. 1 (1944); and Comment, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule,* 56 Boston U.L. Rev. 148 (1976).

When dealing with the rule against hearsay and its exceptions according to common law evidentiary principles, admissibility is a question addressed exclusively to the discretion of the trial judge, and the fact finder then gives evidence which is admitted whatever weight it deems appropriate in its prerogative. For a declaration against penal interest to be admissible, it is required that the declarant be presently unavailable. The law is well settled that the invocation of the privilege against compelled self-incrimination is a sufficient showing of unavailability. *Harris v. State, supra,* at 40 Md. App. 63. In terms of the guarantee of trustworthiness, the declarations in this case were further buttressed by the administration of the oath. When dealing with the common law of evidence, our predominant consideration is the accuracy of the proffered evidence. In this regard, the statements made by the appellants Lewis and Jacobs, certainly insofar as they implicated themselves, were well corroborated. This is all that is required by the common law of evidence.

### The Inapplicability of Special Constitutional Strictures Where Evidence Is Not Procured by the State

#### (Appellants Lewis and Jacobs)

The appellants Lewis and Jacobs, however, make the further claim that these admissions should have been tested by the same constitutional law of evidence that would be applicable if the statements had been taken by governmental agents and offered in evidence by the State. In this regard, they fundamentally misperceive the distinction between the common law of evidence and the constitutional law of evidence. In insuring not simply the accuracy of the fact-finding process but the fairness of governmental

behavior, the constitutional law, to the extent that it goes further than the common law, is directed at State action. Far more than the reliability of the evidence and the accuracy of the verdict is at stake. Due process generally and the privilege against compelled self-incrimination specifically require that even unequivocally accurate confessions be suppressed if the rights of a citizen were trampled upon by the agents of government in procuring the confession. This constitutional concern was well explicated by *Jackson v. Denno,* 378 U.S. 368, 383-386, 84 S. Ct. 1774, 12 L. Ed. 2d 908, 919-921 (1964):

> "[T]he premise underlying the *Stein* opinion [was] that the exclusion of involuntary confessions is constitutionally required solely because of the inherent untrustworthiness of a coerced confession. It followed from this premise that a reliable or true confession need not be rejected as involuntary and that evidence corroborating the truth or falsity of the confession and the guilt or innocence of the accused is indeed pertinent to the determination of the coercion issue. . . .
>
> This underpinning of *Stein* . . . was unequivocally put to rest in *Rogers v. Richmond, supra,* where it was held that the reliability of a confession has nothing to do with its voluntariness — proof that a defendant committed the act with which he is charged and to which he has confessed is not to be considered when deciding whether a defendant's will has been overborne. . . .
>
> It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his

will,' . . . and because of the 'deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' " (Citations omitted).

In furtherance of this additional societal interest, transcending the mere trustworthiness of evidence, we have erected a superstructure of procedural safeguards. Where a confession has been taken from a defendant by the police and is offered against him by the State, the defendant is entitled to an admissibility hearing outside the presence of the jury. *Jackson v. Denno, supra.* At the hearing, the State, upon appropriate challenge, has allocated to it the burden of demonstrating by the preponderance of evidence that the confession is voluntary. *Rogers v. Richmond,* 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961). The State has the burden, under certain circumstances, of providing a confessing defendant with the assistance of counsel. *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964); *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). The State, moreover, may not take a confession from a defendant who is in custody absent a series of specific warnings followed by appropriate waiver. *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Those states that follow the so-called Massachusetts Rule, furthermore, provide that all of the evidence initially submitted to the judge on voluntariness must be resubmitted to a jury so that they have the opportunity, in effect, to second-guess the judge on the question of admissibility. *Cf. Day v. State,* 196 Md. 384, 399, 76 A.2d 729; *Linkins v. State,* 202 Md. 212, 223, 96 A.2d 246; *Hillard v. State,* 286 Md. 145, 406 A.2d 415.

It is this last requirement which the appellants Lewis and Jacobs urge was not satisfied in the present case. We are not unmindful that the cited Maryland cases seem to speak in universal terms. We remind the appellants, however, that common law *stare decisis* looks not to words but to principles of law manifesting themselves through concrete decisions.

The words on which the appellants rely were uttered in the distinct context of confessions which had been taken by the police and which were offered by the State. The factual circumstances were not remotely apposite to the situation at bar.

There is a residual sense, of course, in which the jury will consider voluntariness, if evidence of voluntariness or involuntariness is offered by either party. Part of the jury's prerogative is to weigh all evidence and to decide how persuasive it is. With respect to admissions, confessions and declarations against interest (pecuniary or penal), that core aspect of voluntariness that goes to the trustworthiness of the statement is very relevant to the weighing process. That additional, latter-day dimension of constitutional voluntariness, however, that looks beyond trustworthiness to the propriety of governmental behavior has no relevance to the weighing function. It is not the job of a jury "to police the police." In this regard, the assessment of the weight to be given a declaration against interest is no different from the assessment of the weight to be given any piece of evidence, exception to the hearsay rule or otherwise. The jury may always ask, "Was the utterance truly spontaneous?"; "Was the admission ambiguous?"; "Was the declaration truly against interest?"; "Did the interest threatened outweigh the benefit to be gained?"; "Did the dying declarant know he was about to die?" In dealing with all such issues, the State is always entitled, in the exercise of its tactical judgment, to offer whatever it thinks will enhance the weight of its own evidence and will diminish the weight of the defense evidence. By the same token, a defendant is always entitled, in the exercise of his tactical judgment, to offer whatever he thinks will diminish the weight of the State's evidence and will enhance the weight of his own. This is but a routine incident of the trial process, civil or criminal. It does not involve the superimposition of those additional constitutional strictures, allocations of the burden of proof and other special procedures aimed at the regulation of governmental behavior.

Early on, this Court recognized the fundamental distinction. Even with respect to a confession which was offered by the State for exclusively inculpatory purposes, we said in *Carder v. State*, 5 Md. App. 531, 539, 248 A.2d 495:

> "While the burden of proving that a confession is voluntary is upon the State, ... the voluntariness test does not apply to a civilian witness who was not in any way associated with the State Police ...."

In *People v. Price*, 46 Cal. Rptr. 775, 406 P.2d 55 (1965), a defendant had made three confessions, two to the police and one to a television news reporter while he was confined in the hospital. Upon review, the two confessions given to the police were held to have been improperly admitted. The confession given to the television news reporter, however, was held to be admissible because the reporter was one not associated with governmental authority. The court held, at 406 P.2d 61:

> "Absent evidence of police complicity, the admission of defendant's statements to the reporter infringed no constitutional right nor defeated any purpose fostered by the recent decisions of the United States Supreme Court and of this court."

In *Trinkle v. State*, 284 N.E.2d 816 (Ind. 1972), the defendant challenged the admissibility of admissions or confessions made by him to the owner of the carpet he was then in the process of stealing. Even though finding that the statements were products of "physical persuasion," 284 N.E.2d at 817, the court, nonetheless, found the statements admissible. It noted, at 819:

> "While the standard of voluntariness is necessary to prevent police abuse of defendants, the same policy does not exist in circumstances involving private citizens. The factor of control is not present. Where police may lock one up and impose burdens on an accused which necessitate protection, a private citizen, confronted by the villain in his own home,

lacks the leverage for abuse which the law enforcement officers possess."

We find most persuasive the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Biggerstaff,* 383 F.2d 675 (1967). The defendant there was convicted of having made false entries on the books with the intent to defraud the bank of which he was then the assistant vice president. Under suspicion, he was taken to a motel room by several of the bank's officers and there interrogated. Inferably, he was threatened with the loss of his job if he did not make a statement. The statement was forthcoming, and at trial, it was challenged. Judge Sobeloff (former Chief Judge of the Court of Appeals of Maryland) held that the challenged conduct of the interrogators was immaterial, saying at 383 F.2d 680:

> "Finally, the defendant maintains that in light of *Garrity v. State of New Jersey,* 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967), his statement to bank officials, made at the motel, was inadmissible. *Garrity* is distinguishable. The question framed by the Court was 'whether the Government, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee.' 385 U.S. at 499, 87 S. Ct. at 620. In contrast, Biggerstaff has not asserted, nor could he reasonably assert, that the conduct of the bank officers constituted government action or government coercion."

In all of the foregoing cases, the challenged statements were introduced by the State in furtherance of the State's case but were held to be beyond constitutional challenge because no State action had been involved in the initial procurement of the evidence. The case before us is even stronger in terms of the remoteness of any constitutional implications. The State here did not introduce the declarations of Lewis and Jacobs. The State went further and actually objected to the introduction of those declarations. Were the appellants to prevail in this

contention, the logical implications would be absurdities. If the burden, which they contend for, had been upon the State and the State had deliberately failed to carry such burden, the State would have been delighted and only the defendant Jackson would have been harmed by denying the jury his key defensive evidence. If the burden, on the other hand, had been upon the codefendant Jackson, what would that constitutional burden consist of? Is one defendant to be required to furnish counsel to his codefendants before interrogating them? If so, what does an indigent defendant do before interrogating indigent codefendants? Must a defendant give *Miranda* warnings before interrogating a codefendant? Must a defendant even refrain from threatening or making promises to a codefendant?

The answer, of course, is that the universal solvent into which all such constitutional considerations dissolve is the Fourteenth Amendment. That Amendment, by its very terms, is addressed only to State action:

"No State shall . . . ."

Lawrence Jackson is not the State. The special obligations imposed upon the State are not imposed upon Lawrence Jackson.

### The Bruton Problem and Confrontation

#### (Appellants Lewis and Jacobs)

With respect to the declarations against penal interest made by the appellants Lewis and Jacobs, Judge Ross gave the following instruction to the jury:

> "There is evidence that both the Defendant Jacobs and the Defendant Lewis made statements concerning the charges against the Defendants. Before you may consider these statements as to any of the defendants you must first decide whether or not any of the statements were made by either Lewis or Jacobs. If you decide one or more of the statements were made by either or both of them, any such statement or statements shall be weighed

and considered by you like other evidence which reflects on their believability. You may consider any statement which you find was made by Jacobs in deciding the guilt or innocence of Jacobs or Jackson, and you may consider any statement which you may find was made by Lewis in deciding the guilt or innocence of Lewis and Jackson; however, you may not consider any statements by Jacobs in deciding Lewis's guilt or innocence, and you may not consider any statements by Lewis in deciding Jacobs's guilt or innocence."

The appellants Lewis and Jacobs now contend that under *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), such sanitizing instructions are inefficacious. Each urges that he was denied his right to confront his accuser when his codefendant's statement was heard by the jury. In this contention, Lewis objects to the introduction of Jacobs's statement and Jacobs, in turn, objects to the introduction of Lewis's statement. The contentions, however, are constitutionally untenable, because each confessed and the confessions were interlocking. This Court actually anticipated the constitutional law in this regard in *In re Appeal No. 977,* 22 Md. App. 511, 517, 323 A.2d 663, wherein we pointed out:

"The exclusionary rule of *Bruton* has been held to be inapplicable when the co-defendant's out-of-court confession . . . merely "interlocks" with the defendant's own statements . . . ."

This reading of *Bruton* was affirmed by the Supreme Court in *Parker v. Randolph,* 442 U.S. 62, 99 S. Ct. 2132, 60 L. Ed. 2d 713, 724-725 (1979):

"We therefore hold that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution."

## The Severance Problem

### (Appellants Lewis and Jacobs)

The severance contention made by the appellants Lewis and Jacobs falls with the failure of their earlier contentions. Their contention that the trial of each should have been severed from the trial of the other falls with the *Parker v. Randolph* limitation upon *Bruton v. United States*. Their contention that their trial should have been severed from that of Jackson falls with our holding that their declarations against penal interest were generally admissible.

They add a nuance to this contention. They urge that even if their declarations against penal interest were admissible for purposes of exculpating Jackson, they were, nonetheless, inadmissible for purposes of inculpating themselves. When dealing with the common law of evidence, as we are here, we know of no such one-way streets. The question with respect to those challenged declarations was not Who would be helped or hurt by their admission? but Were they competent? The law of evidence is neutral. If the evidence is unworthy of belief, it may not come in for any purpose, either to exculpate or to inculpate. On the other hand, if the evidence is worthy of belief, it comes in for all purposes, inculpatory as well as exculpatory. Blind Justice does not manipulate her scales according to whose interests are being served.

*Judgments affirmed; costs to be paid by appellants.*