SPIRO T. AGNEW *v.* STATE OF MARYLAND ET AL.

[No. 903, September Term, 1981.]

*Decided June 1, 1982.*

The cause was argued before MORTON and MOORE, JJ., and RICHARD M. POLLITT, Associate Judge of the First Judicial Circuit, specially assigned.

*T. Rogers Harrison,* with whom were *Mudd & Harrison* on the brief, for appellant.

*David L. Scull,* with whom were *Kass & Skalet, William A. Dobrovir* and *Dobrovir, Oakes & Gebhardt* on the brief, for appellees John McMillen et al. *Diana Gribbon Motz, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee State of Maryland.

MOORE, J., delivered the opinion of the Court.

On October 5, 1976, three Maryland taxpayers sued Spiro T. Agnew, former Vice President of the United States (1969-73), Governor of Maryland (1967-69), and Baltimore County Executive (1963-67), to recover certain payments allegedly made to him in connection with State Roads Commission contracts during his terms of office. The action sought an accounting, imposition of a constructive trust, and restitution. Five years later, the suit properly arrived at this Court [1] after an arduous airing of the issues, with the State ultimately participating as intervenor. On May 7, 1981, a judgment of $147,500 plus interest of $101,235 was awarded against Mr. Agnew in the Circuit Court for Anne Arundel County (Williams, J.). On appeal, he presents nine issues:

1. Whether the sworn statements of I. H. (Bud)

---

[1] On September 28, 1977, an appeal was taken from the August 30 opinion of Judge Williams overruling Mr. Agnew's demurrer to the Bill of Complaint. The plaintiffs moved for an order striking the appeal pursuant to Md. Rule 1009, and to dismiss the appeal pursuant to Rule 1035(b) (1). On December 12, 1977, the latter motion was granted.

Hammerman, II, Lester Matz, Allen Green, and Jerome B. Wolff, made to the United States Attorneys in 1973, were properly admitted into evidence.

2. Whether Mr. Agnew's plea of *nolo contendere* to federal tax evasion was properly admitted against him.

3. Whether intervention by the State of Maryland was properly granted.

4. Whether the judgment was outside the cause of action stated in the complaint, thus denying Mr. Agnew due process of law.

5. Whether the State of Maryland is estopped from imposing financial liability upon Mr. Agnew.

6. Whether the testimony of George W. White, Jr., Mr. Agnew's attorney for several years, was erroneously compelled and inadmissible.

7. Whether the trial judge's award of prejudgment interest constituted an abuse of discretion.

8. Whether liability and damages were established by clear and convincing proof.

9. Whether the lower court's procedural and evidentiary rulings cumulatively deprived Mr. Agnew of a fair and impartial trial.

The taxpayers cross-appealed, claiming that the trial court erred in dismissing them, after the trial, for lack of standing. They contend, first, that they proved special damages to the full extent required by Maryland case law, and, second, that the "enormous public importance" of the case was sufficient to confer standing even if it was technically lacking.

Because the four sworn statements referred to in issue No. 1 supplied the "majority of facts" upon which the trial judge said he relied, the question of their admissibility is logically the fulcrum of the case. Before proceeding to this issue, we present a factual backdrop for this unfortunate historic episode.

I

Under a system described by Mr. Agnew as a "long-established pattern of political fund-raising in the State," *Maryland State Bar Association v. Agnew,* 271 Md. 543, 552, 318 A.2d 811 (1974), some engineering and architectural firms were accustomed to making "political contributions" in cash in return for being awarded contracts involving road and bridge construction by the State Roads Commission. The head of this commission in 1967-69 was Mr. Wolff, appointed by then Governor Agnew.[2] The latter's political supporter and friend was Mr. Hammerman, who met with Mr. Wolff to set up a system to collect and distribute the cash "contributions." The plan was that Mr. Wolff would inform Mr. Hammerman which of 50 or so engineering firms in the State would be likely to receive a particular contract and Mr. Hammerman would then solicit a payment — ranging from one to five percent of the contract price.

Initially, the money was to be divided equally but, Mr. Hammerman said in his statement, Mr. Agnew vetoed this arrangement, insisting upon half of the payments for himself. Mr. Hammerman retained Mr. Agnew's share of the payments in a safe deposit box. Upon inquiry by Mr. Agnew from time to time, Mr. Hammerman would tally the number of "papers" he had — a "paper" being $1,000 — and deliver the money in a plain envelope to Mr. Agnew. This system netted $60,000 for Mr. Agnew, according to Mr. Hammerman.

Two engineers, Allen Green of Green Associates, Inc., and Lester Matz of Matz, Childs & Associates, Inc., preferred the direct approach. Mr. Green said in his statement that he delivered to Mr. Agnew five or six times a year an envelope containing $2,000 to $3,000 in cash. With the assistance of Internal Revenue Service agents, Mr. Green determined

---

2. Mr. Agnew's public service began with his election in 1962 to the office of Baltimore County Executive. In 1966, he was elected Governor. He won the Republican nomination for Vice President in 1968, and he and Richard M. Nixon were inaugurated in 1969.

from his business and personal records that he paid Mr. Agnew $11,000 in both 1967 and 1968, $8,000 in both 1969 and 1970, and $6,000 in both 1971 and 1972, a total of $50,000.

Mr. Matz in his statement revealed that he gave Mr. Agnew an envelope containing $20,000 in cash on July 17, 1967, the money then "owed" by his firm in connection with state contracts. Early in 1969, Mr. Matz went to the White House and gave Mr. Agnew an envelope containing $11,000 in cash, again characterizing this payment as money "owed" for contracts received during Mr. Agnew's tenure as governor. Several subsequent payments adding up to $6,500 were made, according to Mr. Matz, aggregating the total sum of $37,500.

This allegedly "long-standing system" became public knowledge in 1973 with the disclosure that the months-long investigation by the United States Attorney's office for the District of Maryland had led to Mr. Agnew, then Vice President.[3] From June until October of that year, the investigation, which had grown out of a grand jury probe of an alleged kickback scheme involving Baltimore County officials and construction contractors, rapidly enveloped Messrs. Agnew, Matz, Wolff, Green, and Hammerman, culminating in a criminal information against Mr. Agnew for felony tax evasion.[4]

On October 10, 1973, in the United States District Court for Maryland, Mr. Agnew's plea of *nolo contendere* to that charge was accepted just as his letter of resignation was being delivered to the Department of State. Present at that uniquely fateful event was then United States Attorney

---

**3.** "A Heartbeat Away" by Jules Witcover and Richard M. Cohen, both employed by *The Washington Post,* pulls together the myriad facets of Mr. Agnew's political career and media coverage of the "catastrophe." The book is an amalgamation of reportorial interviews, public disclosures, and historical background. Mr. Agnew's own account of his ordeal is contained in "Go Quietly . . . or else," a book that figured in this case. *See* n.11, *infra.*

**4.** Mr. Agnew pleaded *nolo contendere* to a violation of 26 U.S.C., Internal Revenue Code, § 7201 (Attempt to evade or defeat tax) (1976 ed.) by understating his income for 1967 by $29,500. The penalty is a fine of not more than $10,000, or five years' imprisonment, or both.

General Elliott Richardson who stated in part for the federal government:

"In accordance therefore with the agreement of counsel, I offer for the permanent record of these proceedings an exposition of the evidence [5] accumulated by the investigation conducted by the Office of the United States Attorney for the District of Maryland as of October 10, 1973.

Because this exposition is complete and detailed, it is sufficient for present purposes simply to state that this evidence establishes a pattern of substantial cash payments to the defendant during the period when he served as Governor of Maryland in return for engineering contracts with the State of Maryland.

. . . .

[As to sentencing,] I am firmly convinced that, under all the circumstances, leniency is justified. I am keenly aware, first, of the historic magnitude of the penalties inherent in the Vice President's resignation from his high Office and his acceptance of a judgment and conviction for a felony: To propose that a man who has suffered these penalties should, in addition, be incarcerated in a penal institution, however brief, is more than I, as head of the government's prosecution arm, can recommend or wish.

. . . .

Out of compassion for the man, out of respect for the Office he has held, and out of appreciation for the fact, by his resignation, he has spared the Nation a prolonged agony that would have attended upon his trial, I urge that the sentence imposed on the defendant by this Court not include confinement."

---

5. The 40-page exposition and the four sworn statements were admitted into evidence, although Judge Hoffman disregarded the charges, countercharges and denials contained in them insofar as they did not pertain to the income tax charge.

Before sentencing Mr. Agnew declared, *inter alia*:

"My decision to resign and enter a plea of nolo contendere rests on my firm belief that the public interest requires a swift disposition of the problems which are facing me. . . .

I am aware that witnesses are prepared to testify that I and my agents received payments from consulting engineers doing business with the State of Maryland during the period I was Governor.

With the exception of the admission that follows, I categorically deny the assertions of illegal acts on my part made by government witnesses.

I admit that I did receive payments during the year 1967 which were not expended for political purposes and that therefore these payments were income, taxable to me in that year, and that I so knew.

I further acknowledge that contracts were awarded by state agencies in 1967 and other years to those who made such payments and that I was aware of such awards. I am aware that government witnesses are prepared to testify that preferential treatment was accorded to the paying companies pursuant to an understanding with me when I was Governor. I stress, however, that no contracts were awarded to contractors who were not competent to perform the work and, in most instances, state contracts were awarded without any arrangement with the payment of money by the contractor.

I deny that the payments in any way influenced my official actions."

Mr. Agnew was sentenced to three years' imprisonment which was suspended, placed on probation,[6] and fined

---

6. In *United States v. Agnew*, 428 F.Supp. 1293 (D.Md. 1977), Judge Thomsen ruled that Mr. Agnew had not violated his probation as charged by a plaintiff in a civil action seeking $1 million in damages. Despite some "technical violations," the Department of Justice and the probation depart-

$10,000. *United States v. Agnew,* Crim. No. 73-0535 (D.Md. 1973). Subsequently, he paid an additional $148,000 in federal income tax, including penalty and interest.

Mr. Green pleaded guilty to income tax evasion under 26 U.S.C. § 7212(a) (1976 ed.) and served one year in prison. *United States v. Green,* Crim. No. 74-0685 (D.Md. 1974).

Mr. Hammerman also pleaded guilty to the same charge and was sentenced to 18 months' imprisonment and fined $5,000. *United States v. Hammerman,* Crim. No. 74-0684 (D.Md. 1974). Upon appeal, however, his plea was held involuntary and the conviction was reversed. *United States v. Hammerman,* 528 F.2d 326 (4th Cir. 1975).[7] After remand, the government chose not to prosecute. Mr. Matz and Mr. Wolff were never charged.

In the civil action now before us, Mr. Wolff and Mr. Hammerman were original defendants with Mr. Agnew but were dismissed from the case as discussed, *infra.*

II

The protracted proceedings in this case require more than our usual brief summary.

The Bill of Complaint was filed on October 5, 1976, by taxpayers John A. McMillen, Reina Chassy, and Suzanne Saul, "on behalf of the State of Maryland," against Spiro T. Agnew, Jerome B. Wolff, and I. H. Hammerman, II. The four-count bill sought an accounting, imposition of a constructive trust and restitution. Between then and May 20, 1977, both sides engaged in pretrial sparring, testing the canvas, so to speak, with demurrers, preliminary objections, and divers motions. After a hearing on May 20, Judge Williams issued the first of several memorandum opinions and orders. The August 30 order denied Mr. Hammerman's

ment recommended that no hearing on revocation of Mr. Agnew's probation was warranted.

**7.** In this case, Judge Craven referred to Mr. Hammerman's sworn statement as "specifying his role as bagman for Agnew." *Id.* at 328.

preliminary objection, based on laches, and overruled demurrers of Mr. Agnew and Mr. Wolff. The principal findings were that the equity court had proper subject matter jurisdiction under Md. Rule 323 (a) (10) (1982 ed.) and the taxpayers had standing to sue.

Undeterred, Mr. Hammerman then filed on September 14, 1977, a demurrer which was overruled on February 9, 1978. Later that month, Mr. Agnew filed a motion to dismiss the case because it failed to meet the requirements of a class action under Md. Rule 209. This motion was heard on April 28 along with a motion by Mr. Hammerman to reconsider the overruling of his demurrer. The former was taken under advisement (and finally granted at the conclusion of the case) and the latter was denied.

In June 1978, the deposition phase of the proceedings began, Mr. Agnew and Mr. Hammerman having answered the complaint. By December 1, 1978, discovery had foundered as the defendants asserted their privilege against self-incrimination at deposition proceedings.[8] On February 5, 1979, the trial judge ruled in another memorandum opinion and order that Md. Cts. & Jud. Proc. Code Ann. § 5-106 (e) and (f), as amended, preserved the State's right to prosecute, without statutory limitation, for bribery, malfeasance or conspiracy prior to July 1, 1978, a ruling not challenged on this appeal. The judge reiterated a previous ruling that the possibility of incrimination existed, justifying invocation of the privilege against self-incrimination. *See Payne v. Payne,* 33 Md. App. 707, 715, 366 A.2d 405 (1976), *cert. denied,* 280 Md. 733 (1977). The defendants' and deponents' assertions of their Fifth Amendment privilege, the court ruled, were adequate, "although no models of clarity."

---

**8.** The plaintiffs in their motion to compel discovery related that at deposition, Mr. Hammerman refused to answer questions beyond name and address, relying on "advice of counsel." Mr. Wolff similarly refused, citing his "privilege against self-incrimination," as did Mr. Agnew, relying "on the grounds of personal privilege." In opposition to that motion, Mr. Hammerman relied on Md. Rule 372 (b) (1), which covers admissions of averments, as did Mr. Agnew and Mr. Matz. The rule applies to pleadings, not to testimony. *See* Mayor of Ocean City v. Taber, 279 Md. 115, 367 A.2d 1233 (1977). On October 3, 1978, the parties stipulated that Mr. Matz would invoke the Fifth Amendment privilege at his deposition.

On October 23, 1979, the taxpayers filed a motion for summary judgment, supported by a lengthy memorandum and accompanied by official certified copies of the sworn statements of Messrs. Wolff, Hammerman, Matz, and Green. Mr. Hammerman responded in kind, as did Mr. Wolff.

In his fourth memorandum opinion and order, Judge Williams denied all motions for summary judgment and ruled that the four statements plus the "sworn confession" [9] of Mr. Agnew at the federal proceeding were admissible as exceptions to the hearsay rule, either as admissions by a party opponent or declarations against penal interest or both. With respect to the plaintiffs, the judge warned that "[i]n order to maintain their standing and to establish liability on the part of the defendants," they had to prove "special damages or loss which is peculiar to them as taxpayers."

In the face of this potential weakness in the taxpayers' case, the State of Maryland filed a motion to intervene under Md. Rule 208(a), claiming that the State had interests which were or might be inadequately represented by the taxpayers and that the State would be bound by any judgment in their action. This motion also produced a barrage of legal memoranda, amid charges of delay hurled by both sides. In November Judge Williams granted the State's motion to intervene, approved a consent order dismissing Mr. Hammerman as a defendant,[10] and set a trial date for April 20, 1981.

On February 3, 1981, the State as intervenor moved for summary judgment. A month later, Mr. Agnew moved to dismiss the taxpayers as plaintiffs because they had produced no evidence showing special damages and the State represented all taxpayers. Mr. Agnew also asked for a con-

---

**9.** By order filed on October 15, 1980, Judge Williams struck the phrase, "sworn confession" from his June 19 opinion and substituted, "the admissions in open court." The change resulted from Mr. Agnew's motion for reconsideration.

**10.** Under the terms of the order filed November 10, 1980, Mr. Hammerman was to pay $30,000 plus interest ($52,455 total) to the State in return for releases from liability executed by the State and the taxpayers. Both also agreed not to call Mr. Hammerman as a witness.

tinuance. On March 18, counsel were heard on the pending motions. Meanwhile, the pace of the paperwork accelerated as the trial date neared. Interrogatories, depositions, stipulations, requests for documents and assorted motions flew back and forth, with appropriate orders being issued by Judge Williams as required.

At a pretrial conference on April 13, the court decided most of the outstanding motions, except one by the State to compel George C. White, Mr. Agnew's former attorney, to testify. A week before trial, Mr. Wolff signed an agreement with the State to testify in return for use immunity and dismissal of the case against him. On the first day of trial, Judge Williams ruled that Mr. Agnew in his book, "Go Quietly . . . or else," [11] had waived the attorney-client privilege in regard to conversations with Mr. White dealing with campaign contributions and alleged kickbacks, and that Mr. White's testimony was compellable.

After three days of trial, which included testimony by experts to establish the damages resulting from the alleged kickbacks and bribes, Mr. Wolff was dismissed as a party defendant, the State was awarded a judgment of $248,735, consisting of $147,500 found to be held in constructive trust by Mr. Agnew and $101,235 in pre-judgment interest, and the taxpayers were dismissed as plaintiffs. This appeal followed.

## III

Maryland is now with those jurisdictions [12] that admit into evidence declarations or statements against penal inter-

---

**11.** The book is published by William Morrow and Company, Inc., N.Y. 1980, and is dedicated to Mr. Frank Sinatra. Judge Williams, in a reference to the literary work, remarked at oral argument on April 21, 1981, "I have unfortunately suffered through some of Mr. Agnew's book," and this prompted a motion for disqualification by Mr. Agnew on the basis of bias. In denying the motion, Judge Williams said his comment "was editorial in nature and referred only to the literary style of the book as a whole." He added that it was necessary to read the book to decide the motion to compel testimony from Mr. White, and that he was in no way prejudiced or biased against Mr. Agnew.

**12.** California, Nevada, New Jersey, Utah, Kansas, New Mexico, and Wisconsin, among others, have codified the evidentiary exception of decla-

est as exceptions to the exclusionary rule against hearsay.[13] The death blow to the former judicial policy [14] of prohibiting the admission of such declarations was efficiently administered by this Court in *Harris v. State,* 40 Md. App. 58, 387 A.2d 1152 (1978), which held that exclusion of a declaration against penal interest was reversible error. In remanding for a new trial, Judge Morton stated that a declaration against one's penal interest, standing alone, has an inherent *indicium* of trustworthiness. Only in those cases where it is shown to be untrustworthy, frivolous or collusive should a declaration against penal interest be withheld from admission. *Id.* at 65, *quoting Dyson v. State,* 238 Md. 398, 407, 209 A.2d 609 (1965), *vacated on other grounds,* 383 U.S. 106 (1966).

In another recent case, *Jacobs v. State,* 45 Md. App. 634, 415 A.2d 590 (1980), *cert. denied,* 288 Md. 737 (1980), Judge Moylan held that, if deemed trustworthy by the trial judge, a declaration against penal interest is admissible,

> "whether the forum is civil or criminal; whether the declaration is offered by a plaintiff, a civil defendant, the State, or a criminal defendant; whether it is offered for inculpatory

rations against penal interest. In addition various states have held such declarations admissible in certain circumstances. For a comprehensive discussion of those rulings, *see People v. Edwards,* 242 N.W.2d 739 (Mich. 1976). For the statutes and cases adopting the exception, *see* Note, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule,* 56 Boston U.L.Rev. 148, n.5 at 149 (1976).

13. The federal rule is set forth at Rule 804(b) (3), Fed. Rules of Evid:
   (b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ...
   (3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

14. Known as the Sussex Peerage rule, this legal precedent has not only been abandoned in Maryland, contrary to appellant's brief, but also has been well and truly buried. It is questionable whether it was ever firmly adopted by this State. *See Jacobs v. State,* 45 Md. App. 634, 415 A.2d 590 (1980), in which the historical explanation for this "monumental joke" is succinctly stated. *Id.* n.3 at 647. *See also* Baker v. State, 336 So.2d 364 (Fla. 1976).

> or exculpatory purposes. If it is trustworthy, it comes in for all purposes; if it is not trustworthy, it may not come in for any purpose."

*Id.* at 643.

Trustworthiness of the statement is predicated on the commonsense theory that a reasonable person will not say anything contrary to his own self-interest (be it pecuniary, proprietary or penal)[15] unless he knows or believes the words to be true. 5 *Wigmore on Evidence* § 1457 at 262 (3d ed. 1940). *See also* § 1461 at 266.[16] Because trustworthiness forms the foundation upon which admissibility rests, courts have looked to various *indicia* by which to measure this quality. *See Houck v. DeBonis,* 38 Md. App. 85, 379 A.2d 765 (1977), *cert. denied,* 282 Md. 733 (1978) *sub nom, Conklin v.*

---

**15.** Some courts have declined to segregate strictly the three interests. As the Court in *Breeden v. Independent Fire Insurance Co.,* 530 S.W.2d 769 (Tenn. 1975), pointed out: "Indeed, declarations against penal interests are only semantically different from those against pecuniary interests, since a declaration of guilt of criminal conduct subjects the declarant to both criminal and civil liability, as a general rule." *Id.* at 774-5. The case recognized the exception and formulated guidelines for its application in civil actions. In *Howard v. Jessup,* 519 P.2d 913 (Okla. 1973), the Court observed that the principle of self-protection and self-interest operates with at least equal force in cases of declarations against penal interests as in those involving pecuniary or proprietary interests. *Id.* at 917, *citing* 29 Am.Jur.2d, *Evidence* § 620 at 674 (1967). In *Commonwealth v. Nash,* 324 A.2d 344 (Pa. 1974), the concurring plurality concluded that there was no logical ground upon which declarations against penal interest could be distinguished from declarations against pecuniary and proprietary interest. *Id.* at 347. *See also* State v. Leong, 465 P.2d 560, 564 (Ha. 1970); State v. O'Clair, 292 A.2d 186 (Me. 1972); McKelvey v. Casualty Co., 142 N.E.2d 854 (Ohio 1957); Laumer v. United States, 409 A.2d 190 (D.C.C.A. 1979); Letendre v. Hartford Accident and Indemnity Co., 236 N.E.2d 467 (N.Y. 1968).

**16.** *Wigmore* states that "a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting." § 1457 and cases discussing this "principle of experience."

In *Breeden v. Independent Fire Insurance Co.,* 530 S.W.2d 769, 771 (Tenn. 1975), the Court termed the declaration against interest exception a "fascinating and sometimes frustrating rule" that "is bottomed largely on the premise that such declarations are reliable because it is contrary to human nature for one to make an assertion at variance with his ... best interests." *See also,* United States v. Riley, 657 F.2d 1377, 1383 (8th Cir. 1981); People v. Spriggs, 389 P.2d 377, 381 (Calif. 1964).

*Maryland,* 434 U.S. 967 (1977); *contra, People v. Edwards,* 242 N.W.2d 739, 746 (Mich. 1976) (preliminary showing of trustworthiness not required for admissibility). Six "foundation factors" are enumerated and analyzed in Note, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule,* 56 Boston U.L. Rev. 148 (1976):

1. The declaration must have the potential of actually jeopardizing a penal interest.

2. The declaration must be against a penal interest at the time it is made.

3. The declarant must perceive the disserving quality of the statement.

4. The relevant portion of the declaration must be related to its disserving character.

5. There must be no probable motive to falsify the declaration.

6. The declarant must be acting as a reasonable person.[17]

Applying each factor to a particular case will indicate the probable existence of the truth-telling stimuli. When applied separately and weighed cumulatively, the factors will determine the probability of trustworthiness. This task is the province of the trial judge in resolving the question of admissibility. It is then for the trier of fact to determine the evi-

---

[17]. The author of the Note discusses two additional *indicia* of trustworthiness — corroboration of the facts asserted and the relationship between the witness repeating the declaration and the proponent of the evidence. In his view, these factors should be considered only when "the inadequate establishment of one or more of the foundation factors has weakened the presumption of trustworthiness." He observes that these two additional *indicia* usually affect the weight of the evidence, not its admissibility. Note, *supra,* at 172.

"Most courts, in admitting declarations against penal interest, have recognized that their unrestricted admission would be an open invitation to perjury of a kind that would be most difficult to ascertain. Thus, with few exceptions, they have circumscribed the admission of such declarations with specific safeguards. . . ." State v. Haywood, 249 S.E.2d 429, 441 (N.C. 1978).

dentiary value of the admitted statements, within the framework of cautionary instructions as necessary.

Initially, the court here determined that the statements were against penal interest and therefore admissible. The trier of fact, Judge Williams, stated:

> "The court has evaluated the testimony with regard to these statements, how they came to be prepared, who had input into the preparation of these statements, the conditions under which they were prepared, and has concluded ... that there is no basis for finding that these statements are untruthful or unreliable. I think all the circumstances under which they were prepared and given by each of the persons involved indicates truthfulness, reliability, accuracy and they are accepted as such by the court."

Of the six factors, the most critical in this case is whether the statement of each declarant is really against the individual's penal interest.[18] Here we have a unique situation — statements allegedly against penal interest, made outside a judicial setting but upon oath, under intense pressure, for the purpose of implicating a former state governor and then vice president of the United States in a tawdry bribery scheme. The penal interests of the declarants are somewhat clouded by the self-serving patina of their admissions and

---

18. Certainly we can recognize when a statement is not against penal interest — the murderer who is entering the death chamber has no penal interest against which to speak. People v. Riccardi, 340 N.Y.S.2d 996, 999 (Cty.Sup.Ct. 1972). And we have little trouble identifying the purely self-serving statements that tend to exculpate the declarant, *United States v. Thomas*, 571 F.2d 285 (5th Cir. 1978), or statements made to curry favor with the authorities, *United States v. Palumbo*, 639 F.2d 123, 128 (3d Cir. 1981), or statements that inculpate a third person more egregiously than the declarant, United States v. Riley, 657 F.2d 1377, 1384 (8th Cir. 1981). The Court in *Laumer v. United States*, 409 A.2d 190, 202 (D.C.C.A. 1979) stated: "Some proffered declarations will no doubt be excluded because the statement, although facially against the declarant's interest, could not subject the declarant to criminal liability. Under these circumstances the nonexistence of potential criminal liability poses no deterrent to falsification." *See also* United States v. Alvarez, 584 F.2d 694 (5th Cir. 1978), which adopted a unitary standard of trustworthiness for inculpatory and exculpatory declarations under the federal rules of evidence.

allegations, inferences and innuendoes. Superficially at least, their making the statements was, as appellant forcefully argues, in furtherance of their penal interests, not against those interests. For all the declarants, immunity or less harsh treatment was the hoped-for reward — a safe bet if not a sure thing. And the penalty for not cooperating was certain — federal prosecution for their part in any criminal activity the federal investigators uncovered.

As then Assistant United States Attorney Russell T. Baker, Jr., put it in testimony at the trial of this case:

> "We made it very clear to all four of them . . . that in the end they weren't going to have any choice because we would either do it . . . the easy way or the hard way. The easy way is they come in and cooperate and get some kind of plea agreement with the government. The hard way is we make the case against them, we convict them, they get sentenced to prison and after they've been sentenced to prison we subpoena them into the Grand Jury and compel them to testify under the compulsion of use immunity and under the threat of perjury and they get absolutely no credit for it . . . we confronted them with a proposition where they simply had no choice. . . ."

Obviously, the declarants had a significant stake in telling all they knew about "political corruption in Maryland." Appellant asserts with understandable urgency that declarants' *refusal* to cooperate would have been against their penal interests.

However, the surface strength of appellant's argument dissipates as we delve deeper into the substance of the sworn statements and the circumstances surrounding them. From this analytical excursion, we conclude that the four sworn statements were actually against the declarants' penal interest when made and that those of Messrs. Hammerman, Matz, and Green were properly admitted. (We shall discuss Mr. Wolff's statement, *infra.)*

First, stripped of their self-serving veneer and incrimination of appellant, the statements do delineate the declarants' roles in crimes of bribery.[19] Thus, Mr. Hammerman stated, *inter alia:*

"Typically, the 'system' operated in the following way. The word got around that I was the person to see in connection with state roads engineering contracts. From time to time engineers who were interested in securing such state work would contact me to enlist my help. They would inform me of their interests, and I would reply that I would see what I could do. In some cases an engineer would specify the particular work in which he was interested; in most cases, the engineer would not specify any particular job. There was no need for me to make coarse demands or to issue threats.

The engineers said they knew what was expected of them. We spoke only of 'political contributions,' but the engineers knew better than I how the system worked, that is, that cash payments . . . through me were necessary in order for them to receive substantial state contracts. The 'contributions' were almost always in cash . . . but I did not specify any exact amount to be paid, and I accepted any reasonable sum. Sometimes the contribution was made when the contract was awarded, sometimes when the engineer received payments on the contract.

After an engineer had contacted me, I would call Mr. Wolff and inform him, so that he would know who was to receive favored treatment in the awarding of contracts. . . . As contracts were about to be awarded, Mr. Wolff would advise me that a certain engineer had been selected for a certain job; I in turn would contact that engineer and

---

**19.** In the lengthy excerpts that follow, we have omitted almost all mention of the name of Mr. Agnew. Our purpose is to demonstrate the declarants' implication of themselves in the crime of bribery, absent their implication of Mr. Agnew.

congratulate him. These congratulations operated as signals that a 'cash contribution' was due, and the engineer would come to see me and bring the 'contribution.'

I retained one-fourth of the payments. . . . I participated in this system primarily because I wanted the prestige that I knew would accrue to me . . . I did accept my share of the cash proceeds.

. . .

I also participated in soliciting and receiving a substantial cash contribution from a non-engineer seeking favorable action. . . . He and I thereafter agreed that there would be a $50,000 contribution. My friend eventually brought me $20,000 or $25,000 in cash.

. . .

Mr. Matz told me that if the Government got him, he was going to 'spill the beans' and everybody would be in trouble."

. . .

In his statement, Mr. Matz incriminates himself in the "system" at both the county and state levels:

"... Jones [J. Walter, Mr. Agnew's close friend and campaign fund-raiser] told me that the two of us were going to make a lot of money . . . I inferred from what he said during this conversation that . . . Jones and I could expect substantial favors from the Baltimore County Government.

... I inferred ... that I would have to work through Jones and make any payment through Jones."

. . . .

"... Jones, who was in touch with me quite frequently, requested that I prepare a schedule or table which would set forth the amounts of money that reasonably could be expected from engineers

on the various kinds and sizes of consulting contracts that the county generally awarded."

. . . .

"When I gave a copy of this schedule to Jones, he told me that I would be expected to pay him for our county contracts. He said that as our company received fees from the County, payments were to be funneled to him in the appropriate percentages, 5% on engineering contracts and 2½% on surveying contracts. . . . These payments were not described by Jones as 'political contributions'; they were payments made in return for the contracts.

Thereafter, I discussed the proposition with Childs [John, a partner in Matz, Childs and Associates, Inc.]. . . [W]e both believed that the payments would make a substantial difference in the amount of work that our company would receive from the county.

. . . From time to time, Jones would advise me that we had been awarded a particular contract. I knew that under my arrangement with Jones the necessary payments were due. Therefore, I would deliver the required cash payments personally to Jones in his office. On most occasions, I placed the necessary cash in plain white envelopes. Usually I paid Jones in installments rather than one total payment in advance.

First Childs and I personally generated the necessary cash to make these payments. As the size of the payments to public officials increased, however, we found that we could not conveniently raise enough cash without involving a few of our most trusted employees. Therefore, we began to pay increased bonuses to a few employees, and we asked them to return a portion of the increase to us in cash. The corporation reported on our federal corporate tax returns the total amounts of the bonuses and deducted those amounts. Cash was also generated

in other ways which I have not detailed here. I have advised the United States Attorney's office of these additional methods. The cash money that we accumulated in these ways was kept in an envelope in our safe in our office. When a payment was due, I would remove the necessary amount of cash from the envelope."

. . . .

"The amount of work that our company received from the State Roads Commission continued to increase substantially, and, on at least one occasion, I was asked by Wolff if I was taking care of my 'obligations' with respect to these contracts. I told him that I was taking care of my obligations 'directly.'

. . . Childs and I decided that we would make payments after we received fees from the State.

. . . I did deliver cash payments to Wolff in connection with State Roads Commission business."

. . . .

"Sometime in late June or early July, 1968, I calculated that we owed Governor Agnew approximately $20,000 on the basis of 5% of the fees that we had already received from the state. I reviewed this calculation with Childs, and he agreed.

We did not believe that we could generate this amount of money in cash inside the company. Therefore, we decided to go outside the company for the necessary cash money. . . . [deleted] [20] and I agreed upon the following scheme: our company would by corporate check 'lend' [deleted] $30,000; [deleted] would then generate $30,000 in cash

---

**20.** Appellant's brief states that "substantial expurgations" rendered these sworn statements inadmissible, but cites no authority. The minor deleted portions are names of individuals and firms that were excised by the Department of Justice on grounds of personal privacy. The deletions were shown through testimony to be nonfraudulent and of no probative value. *See* Baldwin v. Baker, Civil No. 75-1221 (D.D.C. 1978).

through his company which he would return to me; [deleted] would repay the 'loan' to our company by $1,700 quarterly checks to our company for principal and interest; and I would return these 'loan repayments' to [deleted] in cash."

. . . .

Finally, Mr. Green's sworn statement includes the following:   .

". . . I could generate a large portion of the cash necessary to make these payments by means in my company that would obscure the purpose of the payments and avoid the necessity of accurately describing the true nature of the deduction on my corporate tax returns. In addition, I often made cash payments on behalf of my company in return for having been awarded government contracts and in order to remain eligible for further contracts. Cash was used by me for the simple reason that checks could have been traced and might have led to the discovery of these illegal payments. These payments, both legitimate and otherwise, formed a pattern over the years and reflected my understanding, based upon experience, of the system in which a firm such as ours must participate in order to insure its survival and growth in the State of Maryland."

. . . .

"It was seldom necessary, in my experience, for there to be any express prior agreement between an engineer and a public official in Maryland. Under this system, which each state administration perpetuated, the connection between payments and contracts rested on a largely tacit understanding under which engineers knew that if they did not pay, they would not receive very many contracts and that if they did pay, they would receive favored treatment. Therefore, when a politician requested a payment or when an engineer offered one, it was

not necessary for anyone to expressly refer to the connection between payments and contracts because everyone understood the system, and could rely upon it without actually talking about it."

. . . .

". . . Further I told him that . . . it would be possible for me to make periodic cash payments to him. . . .

On the basis of my experience, I had developed a policy that, where required, I would make payments in amounts that did not exceed an average of one per cent of the fees that my company anticipated receiving on public engineering contracts. . . . I had been able to persuade public officials that their demands were unrealistic. I had come to the conclusion that my company could not afford to pay more than one per cent and, in areas where more was demanded, I had simply refused to pay and had sought work elsewhere.

My principal purpose in making payments . . . was to influence him to select my company for as many State Roads contracts as possible."

. . . .

". . . A third method involved corporate payments to [deleted], a portion of which would be returned by him to me in cash. . . . did not know that the cash was to be used by me for illegal payments to public officials."

. . . .

"Between 1967 and 1968, I paid a limited amount of cash to Wolff on a few occasions. . . . Wolff came to me with a list that he had prepared of the contracts that my company had received from the State Roads Commission . . . I concluded that the list . . . could possibly be used as a means of assessing what was owed . . . in return for those contracts. Wolff and I discussed the contracts and fees and, in effect, bargained about the matter."

. . . .

"... I concluded, using rough mental calculations, that I could continue to make payments for possibly several years to come." [21]

. . . .

"... [M]y corporate records had been subpoenaed and that while I was not concerned about records that go back only three years, there was some reason to be concerned about records which go back further ... if earlier personal records were subpoenaed, that my counsel had recommended that I rely upon the Fifth Amendment and refuse to testify. ... I intended to follow this advice.

... I ... advised that I was in serious trouble and expected to be the target of an indictment."

Thus, by their own words, appellants admitted bribing public officials in return for state contracts, a felony in this State under Art. 27 § 23, Md. Ann. Code (1982 Repl. Vol.).[22] It must be remembered that the declarants' immunity or lenient treatment, which was held out to them when they made their statements, covered only federal prosecution. They were never granted immunity of any sort by the State of Maryland, whose law enforcement and tax officials could hardly have been oblivious to the federal investigation. That the words in the statements were potentially incriminating is buttressed by two facts: one, the declarants successfully asserted the Fifth Amendment privilege against self-incrimination in this case to avoid having to answer

**21.** The euphemisms used by the principal participants in this system, such as "payments," "obligations," "cash" or "political contributions" remind us of Paul Richard's observation in "The Scourge of Christ" (1929); "The vagabond, when rich, is called a tourist." Calling a bribe a payment changes its nature not one whit. It is, as Sir Winston Spencer Churchill remarked in the House of Commons (Feb. 22, 1906) "terminological inexactitude."

**22.** The statute provides for immunity from prosecution, trial and punishment for those who are compelled to testify for the State. The immunity thus afforded displaces the privilege against self-incrimination, and the protection is as broad as the privilege which it displaces. State v. Panagoulis, 3 Md. App. 330, 239 A.2d 145 (1968), aff'd, 253 Md. 699 (1969).

questions at deposition or trial about the events and circumstances described in their statements; *see* n.8, *supra; see also,* Annot. 43 ALR 3d § 3 at 1415 (1972); and two, the declarants were told in writing that if they lied about anything in their statements, they would be prosecuted not only for perjury but also for any criminal activity revealed or inferred from their statements. Appellant argues, of course, that the declarants' interest in obtaining a lesser sentence or immunity from prosecution affects the reliability of their statements and is dispositive of whether they are truly against the declarants' penal interest. His point seems to be that a grant of immunity or leniency in return for a statement inculpating another makes that statement, *ipso facto,* untrustworthy.

Certainly, a statement made under grant of immunity may lessen reliability, *United States v. Gonzalez,* 559 F.2d 1271, 1273 (5th Cir. 1977), but the purpose of granting immunity is to secure testimony which could not otherwise be procured. *State v. Comes,* 237 Md. 271, 276, 206 A.2d 124 (1965). The negotiations here produced only use immunity in the cases of Mr. Matz and Mr. Wolff; and guilty pleas to felony tax evasion in the cases of Mr. Hammerman and Mr. Green. The uncontradicted testimony of then Assistant United States Attorney Baker was:

> "It was all done under an agreement in writing that nothing that they [Matz and Wolff] disclosed to us about Mr. Agnew would be used against them directly or indirectly by the government in any criminal case. . . . [T]hat was the only understanding that we ever had. . . . They never entered into any agreement with the government with respect to whether or not they would be prosecuted or what they would be prosecuted for or what they might plead guilty with. The only agreement they ever had was what we call a use-immunity agreement."

As to Mr. Hammerman and Mr. Green, "[T]hey would not be prosecuted for any other federal criminal offense for their

involvement in the matters under investigation." However, Messrs. Matz, Hammerman and Green were still subject to State prosecution despite this limited immunity and the plea bargains struck by the latter pair. Moreover, use immunity is only co-extensive with the scope of the declarants' privilege against self-incrimination. *Kastigar v. United States,* 406 U.S. 441, 459 (1972). That the penal interests of all four were still at stake is clear from the testimony of Mr. Baker:

"It had been our plan to require them to plead guilty to something and to probably go to jail for a very short period of time. But when Agnew got that ... very lenient deal, we thought it would have been unconscionable to punish the people *who had admitted their own guilt* and come in and cooperated and so we decided not to pursue any criminal penalties with Wolff and Matz. Green and Hammerman already had signed plea agreements under which they would plead guilty and ... we expected a jail term for them. ... But after Mr. Agnew got the pass that he got, we decided that it would be unconscionable for them to be sent to jail and so at their sentencings we, on our own without any consideration from them, urged the court not to send either of them to jail. As you know, the court didn't agree with us on that." (Emphasis added.)

As the Court of Appeals stated in *Merrick v. State,* 283 Md. 1, 17, 389 A.2d 328 (1978) (where the issue was whether declarations against penal interest satisfy the informant credibility aspect of *Aguilar-Spinelli*), admissions of crime carry their own *indicia* of credibility because "[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions," *quoting United States v. Harris,* 403 U.S. 573, 583 (1971). The residual risk and opprobrium of having admitted criminal conduct is not eliminated by being promised a break, Justice Burger for the *Harris* court added, *id.* at 584. Thus, the admission of criminal conduct is sufficient to invoke the possibility of prosecution at the time of that admission. The

existence of the possibility — not the probability — of prosecution puts the declarant's penal interest at risk and is the determinative factor. State v. Haywood, 249 S.E.2d 429, 441 (N.C. 1978). *Cf. United States v. Dovico,* 380 F.2d 325 (2d Cir. 1967), *cert. denied,* 389 U.S. 944 (1967) (possibility of prosecution too remote to make the declaration reliable).

We therefore agree with the trial judge that the facts contained in the statements were adequate to incriminate the declarants, thus making their declarations truly against penal interest. The other five factors, not here determinative, are more briefly weighed:

1. *Were the declarations against penal interest at the time they were made?* Yes, because the investigation of political corruption in Maryland was ongoing, the State had conferred no immunity, the federal immunity and plea bargains were still conditional, and whether declarants were lying was still undetermined.

2. *Did the declarants realize the potential criminal prosecution to which they were exposing themselves?* Yes, because the statements resulted from many meetings among the declarants, their attorneys, federal prosecutors, and others, and the wording chosen reflects the dual goal of the prosecutors, *i.e.,* to incriminate the declarants sufficiently while at the same time building their case against Mr. Agnew. With all the attorneys involved in producing these statements, it could hardly have escaped the collective notice of everyone that prosecution under the state bribery statute was as possible as prosecution by the federal government.

3. *Were the relevant portions of the declarations, used to prove the truth of the matter asserted, related to the disserving portions of the statement?* Yes, because the declarants' implication of themselves and appellant involved one bribery scheme which under Art. 27 § 23 carries the same penalty for the giver as for the receiver. "I took" and "I paid"

are equally felonious.[23] In this case, there was no need to separate the disserving portions of the declarations from neutral or self-serving portions.[24]

4. *Were there probable motives to falsify the declarations?* No, because however much the declarants may have wanted to clear themselves, their statements were prepared by counsel and there existed the threat of federal prosecution for perjury. It is inconceivable that all the players in this drama fabricated a bribery "system" as complicated, far-reaching and widely-accepted as this one simply to "get" the vice president.

5. *Were the declarants acting as reasonable persons?* Yes, because throughout the months-long process that led to their signing of the statements, each one relied on the advice and assistance of very capable counsel. They appear from the record to have reacted as reasonable persons, albeit justifiably worried and anxious, at every twist and turn of the investigation.

In sum, these declarants placed incriminating evidence against themselves in the hands of those who could use that evidence against them. They thus endangered their penal

---

**23.** *See* State v. Canova, 278 Md. 483, 365 A.2d 988 (1976) for a discussion of the common and statutory law of bribery in this State. The case held that the Washington Suburban Sanitary Commission is not a political subdivision within the meaning of Art. 27 § 23 and that criminal informations against commission employees were insufficient.

**24.** The problem of *statements* that are both self-serving and disserving to declarant has divided the treatise writers. One view, with which we agree, would admit the entire statement. 5 *Wigmore on Evidence,* § 1465 at 271 (3d ed. 1940). Another would allow in only those disserving and collateral portions. *McCormick on Evidence,* § 279 at 675-7 (2d ed. 1972). The rationale is that self-serving statements cannot by definition be against interest. *Compare,* United States v. Barrett, 539 F.2d 244, 252 (1st Cir. 1976) (admitting collateral and inculpatory portions) with People v. Leach, 541 P.2d 296, 311 (Cal. 1975) (excluding any portion not specifically disserving) and State v. Abrams, 356 A.2d 26, 28 (N.J.Super.App.Div. 1976). *aff'd,* 370 A.2d 852 (1977) (whole statement admissible). While the extent to which collateral or self-serving portions of the statement are intertwined with inculpatory or exculpatory portions may be a consideration, we believe the better view is to admit the entire statement so as to enable the trier of fact to judge its evidentiary worth in complete context. *See* 2 *Wharton's Criminal Evidence,* § 304, § 306 (13th ed. 1972).

interests to a degree sufficient to demonstrate the probability of trustworthiness that is required for admissibility.

Once the statements are admitted, the trier of fact, be it judge or jury, must consider their probative value. *Jacobs, supra,* 45 Md. App. at 653. This Judge Williams did, finding, *inter alia,* that:

1. The statements presented the court with the majority of the facts concerning the liability of the appellant;

2. There was no basis for believing that the statements were untruthful or unreliable, considering the circumstances of their preparation, their internal consistency, and the corroboration of some of the factual matters contained therein;

3. The deletions had no bearing on the substance of the statements and would not change their testimonial impact;

4. An unlawful relationship existed between Wolff, Hammerman, and Agnew, that extracted from consulting engineers amounts ranging from three to five percent of the contract price, which was divided among the trio; and Agnew actually received $60,000 as a result of this relationship;

5. Green paid one percent of his engineering contracts, for a total of $50,000, directly to Agnew, and his statement is uncontradicted, acceptable, and believable;

6. An unlawful relationship existed between Matz and Agnew, under which Matz made payments to Agnew indirectly or directly, while he held public office as Baltimore County Executive, Governor, and Vice President, aggregating $37,500; and

7. After almost five years of consideration of the case, there was "no question in the court's mind" that Agnew had accepted bribes amounting to $147,500, thereby breaching the public trust and violating his fiduciary duty.

Because admission of declarations against penal interest is "entrusted in the first instance to the sound discretion of the trial judge," *Harris, supra, quoting Brady v. State,* 226 Md. 422, 429, 174 A.2d 167 (1961), *aff'd,* 373 U.S. 83 (1963), our standard of appellate review is the familiar one of abuse of discretion. We find none here. In addition, having reviewed all the testimony and analyzed the statements admitted, we find nothing clearly erroneous in the trial judge's factual findings. *Compare, Laumer v. United States,* 409 A.2d 190, 203 (D.C.C.A. 1979).

In conclusion, we observe that each case will necessarily require an initial determination of admissibility, based on the probability of trustworthiness. As we have indicated, the test of trustworthiness should focus on the six foundation factors, *supra.* All may not be applicable to every case, and none is singularly dispositive, but applying those pertinent will resolve the question of admissibility.

## IV

The State argues that the four sworn statements were also admissible as declarations against pecuniary interest. We think there is substantial evidence to support this position.

A statement that furnishes "any ground, or pretext even," upon which "a person might be sued or proceeded against" is a declaration against pecuniary interest. *Western Maryland Ry. Co. v. Manro,* 32 Md. 280, 283 (1870). While it may not have been immediately apparent to the declarants that their words contravened pecuniary interest, they had to know that implicating themselves in criminal activity might give rise to civil liability. They made the statements after months of discussions. They were fully advised and represented by competent counsel. Even if they did not mentally enumerate the possible civil uses of their statements against them, the facts contained therein were ultimately so decidedly against their pecuniary interest that no one would be inclined falsely to admit their existence. *Houck, supra,* 38 Md. App. at a1.

Some courts have held that declarations against penal interest inherently give rise to civil liability. *See* n. 15, *supra.* While that may not be true in every case, here Mr. Hammerman, formerly a defendant in this civil action, paid $52,445 to the State in settlement. In addition, he pleaded guilty to a tax evasion felony based, in part, on his statement admitting he received money in cash to avoid declaring it on income tax returns. *United States v. Hammerman, supra.* This admission exposed Mr. Hammerman to an action by the Internal Revenue Service to recover taxes due. Mr. Green similarly exposed himself to recovery of taxes due by pleading guilty to a felony tax evasion charge. *United States v. Green, supra.*

Further, Mr. Matz and Mr. Wolff were charged with professional misconduct by the Maryland Board of Registration for Professional Engineers and Land Surveyors under Md. Ann. Code, Art. 75½ § 17(a) (2) (1980 Repl. Vol.). Their certificates to practice their profession could have been suspended, revoked, or not renewed by the Board. As the Court said in *Childs v. McCord,* 420 F.Supp. 428 (D.Md. 1976),[25] *aff'd sub nom, Childs v. Schlitz,* 556 F.2d 1178 (4th Cir. 1977) an action by Messrs. Matz, Wolff, Childs and others seeking a declaratory judgment that compelled testimony could not be used at the Board's disciplinary proceedings: "That plaintiffs will suffer adverse consequences if they lose their right to practice their profession is clear." *Id.* at 434. The financial

---

**25.** The court in *Childs* held that the engineers' compelled, immunized testimony given at the trial of former Baltimore County Executive Dale Anderson, *United States v. Anderson,* 368 F.Supp. 1253 (D.Md. 1973), *aff'd,* 506 F.2d 1398 (4th Cir. 1974), *cert. denied,* 420 U.S. 991 (1975), could properly be used in pending proceedings before the Maryland Board of Registration for Professional Engineers and Land Surveyors to suspend, revoke or refuse to renew their certificates. *Childs v. McCord,* 420 F.Supp. 428, 436 (D.Md. 1976) *aff'd, sub nom. Childs v. Schlitz,* 556 F.2d 1178 (4th Cir. (1977). The court likened these proceedings to those for removal of a judge or disbarment of an attorney, and reiterated that the privilege against self-incrimination pertains only to that conduct carrying criminal penalties. Id. at 432. Subsequently, the licenses of Mr. Matz and Mr. Wolff were suspended but the suspensions were reversed by Baltimore County Circuit Judge Marvin J. Land because the Board had failed to set hearings on the misconduct charges within the six-month period required by law. Like Mr. Agnew, Mr. Wolff was also disbarred, *Maryland State Bar Association v. Wolff,* Misc. No. 21 (Ct. of App., June 24, 1975), a civil penalty also adverse to pecuniary interest.

consequences of losing a license to practice a profession or being pursued by the Internal Revenue Service to pay back taxes are clearly adverse to pecuniary interest.

## V

Appellant asserts that Mr. Wolff's sworn statement was inadmissible for the additional reason that Mr. Wolff was available and did testify at trial. He also contends that the lower court erred in overruling his objections, on grounds of hearsay, to certain live testimony elicited from Mr. Wolff.

The fact is that Mr. Wolff agreed in writing on April 14, 1981, to testify for the State in this case with the assurance that:

"3. Information disclosed by you at trial, deposition or interview in the above-captioned case will not be used against you directly or indirectly in any criminal case, even should such information constitute evidence of crimes committed by you."

He did testify on April 21 and, in return, was dismissed as a party defendant on April 24, at the close of the plaintiffs' case.

Some ten months earlier, the trial court had ruled that Mr. Wolff's statement was admissible as an admission of a party opponent. *Smith v. Branscome,* 251 Md. 582, 589, 248 A.2d 455 (1968); *Harris v. State,* 27 Md. App. 547, 553, n.1, 342 A.2d 305 (1975). At trial, during the plaintiffs' direct case, an authenticated copy of the statement was identified by former Assistant United States Attorney Baker and received in evidence as Exhibit No. 2.

Our examination of the record reveals that no motion to strike Exhibit No. 2 was made by appellant's counsel on the ground above asserted, or on any ground, when Mr. Wolff took the stand. The issue that "he was no longer unavailable and therefore his statement no longer was arguably admitted as a declaration against pecuniary or penal interest," as appellant's brief maintains, has not been preserved for appellate review. Md. Rule 1085.

We turn now to Mr. Wolff's live testimony, a substantial portion of which related his purported conversations with Messrs. Hammerman, Matz, and Green. Appellant's counsel preserved "a continuing objection to that entire line of questioning with reference to what Mr. Hammerman or any other individual said." Usually, a witness who testifies as to what someone else told him is relating hearsay. The very nature of such evidence shows its inherent weakness — the veracity of the witness not present must be assessed second-hand by the trier of fact. 2 *Wharton's Criminal Evidence,* § 265 at 3-4 (13th ed. 1972). *See Judy v. State,* 218 Md. 168, 146 A.2d 29 (1958); *Johnson v. State,* 23 Md. App. 131, 326 A.2d 38 (1974), *aff'd,* 275 Md. 291, 339 A.2d 289 (1975). Mr. Wolff himself answered on cross-examination.

> "It is true that virtually all the information I had was hearsay. Mr. Agnew never said to me that he was getting anything. . . . But there were, I think, the kinds of things that any informed, intelligent human being dealing with others draws as inference, which I think are very frequently as strong as facts. . . ."

While admission of Mr. Wolff's hearsay testimony as to what others said to him was improper, *Capital Raceway Promotions, Inc. v. Smith,* 22 Md. App. 224, 322 A.2d 238 (1974), his untainted testimony was properly admitted, without objection:

> "Q Now, when you signed the statement that is plaintiffs' exhibit number two in 1973, to what extent were the events that are described in that statement fresh in your mind?
>
> A Well, even though the incidents that I described at that time were as long as six years old, I fairly well recollected them and as I kept referring to them, and particularly to the rather copious note taking I had done over my career, I refreshed my recollection fairly well, so at that time I signed this thing, I was quite certain that the events I described were true and complete.

Q  Of course, you know it was under oath ...

A  Yes."

....

"Q  When it came to naming the consulting engineer, who had the ultimate power?

A  Well, the Governor did, basically.

Q  Second to the Governor.

A  Second to the Governor was myself."

....

"Q  In early 1967 did there come a time when Mr. Hammerman came to you with a proposal?

A  Yes.

Q  Would you tell us what it was?

A  The proposal was to undertake an illicit relationship in which I would name certain engineers ...

Q  Speak up just a bit, Mr. Wolff.

A  ... in which I would name engineers whom he would contact, and they would then ... he would then solicit funds for them ... in connection with their choice as engineers on State Roads contracts.

Q  So you would name a contractor ...

A  Generally, yes. He might name them if he ... if he knew someone."

....

"Q  Just to be clear so there's no doubt here ... these things called contributions influenced which contracts were given, did they not?

A  There's no question about that. But we preferred to call them contributions.

Q  Were they in fact political contributions?

A  They might have been. I wasn't particularly squeamish about whether they were or weren't.

Q  Did you report any of these on your income tax?

A  None.

Q  These were cash payments, were they not?

A  They were in cash. They were always in white envelopes.

Q And they influenced which contracts were given?

A To some extent. I might hasten to point out that just in defense of myself that our view was that they would have gotten the contracts, anyway, but that's part of the hypocrisy of that whole matter, you see? The fact of the matter is that we looked upon first the competency of organizations but we would not give it to an incompetent firm whether they paid the moon. Our view was that we looked upon the competency of these organizations first, and then we looked to attempt to elicit the funds from them."

. . . .

"Q After you took the State Roads Commission job, how often if at all did you meet with Mr. Agnew?

A It varied. I would say that I met with him from once a week to twice a week. It was a rare week that I didn't see him at all and in that connection we usually talked about my duties and the assignments I had and I would in many instances refer questions of policy to him. We would sometimes do it by telephone, but usually when it had to do with engineering contracts I always referred the more important ones to him for his review because they were all politically sensitive . . . especially those involved in the toll facilities."

This testimony, plus that in his and the others' statements, is corroborated by secondary witnesses who filled in the crevices. The flotsam of hearsay that floated through Mr. Wolff's testimony was simply not substantial enough to constitute reversible error. *Evans v. Greyhound Corp.*, 200 A.2d 194 (D.C.C.A. 1964).

Further, the judge trying this case was presumptively wise in the ways of hearsay, and allowed the full exposition of testimony with the thought that he could and would excise any hearsay from his consideration. *Director, Patuxent*

*Institution v. Daniels,* 243 Md. 16, 221 A.2d 397 (1966), *cert. denied, sub nom., Avey v. Boslow,* 385 U.S. 940 (1966).

VI

Appellant argues that the admission of the testimony of his former attorney, George W. White, Jr., was a "fatal flaw." He claims that:

1. The attorney-client privilege, Md. Cts. & Jud. Proc. Code Ann., § 9-108 (1980 Repl. Vol.), was not waived by Mr. Agnew through authoring the book, "Go Quietly ... or else," as the trial court ruled;

2. The book was never offered into evidence and its existence or authorship was never authenticated;

3. The testimony at trial concerning Mr. Hammerman's and Mr. Matz's conversations with Mr. White was beyond the scope of the court's order and was, therefore, inadmissible hearsay.

Treating the second claim first, we have before us a motion to correct the record by including a copy of the book which was Attachment 3 to the State's Motion to Compel, filed on April 13, 1981, but "lost in transmission" to this Court. We will grant the motion, observing that the book was received as evidence to decide the motion and the matter of authentication was not raised below. Md. Rule 1085; *Billingsley v. Lawson,* 43 Md. App. 713, 721, 406 A.2d 946 (1979), *cert. denied,* 446 U.S. 919 (1980). Even if it had been raised below, authenticity may be inferred from the admissions of a party. In appellant's memorandum opposing the motion to compel and at oral argument on the motion, appellant's counsel referred to Mr. Agnew's authorship of the book as a given fact.[26] Further, no authentication is

---

26. The reference in the memorandum is: "Parenthetically, the Maryland State Bar Association's Committee on Ethics at no time ruled, determined, or even considered whether or not *Mr. Agnew's authorship of the book,* "Go Quietly ... or else," constituted a waiver [of the attorney-client privilege]. In oral argument, appellant's counsel stated: *"Mr. Agnew has made no effort to put his book* as an issue in this case ...." (Emphasis added.)

necessary when only the contents or the existence of the document is in issue, not its execution. 7 *Wigmore on Evidence* § 2132 at 574 (3d ed. 1940). *See Posko v. Climatic Control Corp.,* 198 Md. 578, 84 A.2d 906 (1951.)[27]

The attorney-client privilege that existed between Mr. White and Mr. Agnew from January 1967, through October 1973, was, like all such privileges, subject to waiver by the client, either express or implied. *State v. Pratt,* 284 Md. 516, 521, 398 A.2d 421 (1979). The intent to waive must be expressed, "either by word or act . . . ," but once disclosed, the confidential matter "is no longer secret, and the privilege which might be claimed disappears." *Harrison v. State,* 276 Md. 122, 137-8, 345 A.2d 830 (1975). *See Trupp v. Wolff,* 24 Md. App. 588, 609, 335 A.2d 171 (1975), *cert. denied,* 275 Md. 757 (1975). It is difficult to conceive of a disclosure more public than this well-known volume which the author himself described as a "detailed revisitation" of the period prior to his resignation as vice president, and which recounts in *haec verba* the conversations between Mr. White and Mr. Agnew regarding Mr. Wolff and Mr. Matz. The purpose of the book, according to Mr. Agnew, was to show his "innocence of the allegations . . . which compelled" him to resign. Whether or not the work succeeds in doing that, Mr. Agnew cannot now assert an attorney-client privilege over matters that "were essentially revealed to the world," as Judge Williams noted.

However, appellant argues that "the alleged disclosures were not made in a testimonial context," and thus were not properly waived, *citing Beckette v. State,* 31 Md. App. 85, 355 A.2d 515 (1976). That case is no authority for the proposition appellant advances here. The court expressly refused to decide whether a letter, "publicly distributed," entitled the State to call the author of it — the accused's attorney —

---

**27.** In *Munshower v. State,* 55 Md. 11 (1880), "*Gruber's Almanac for 1879,*" was admitted to prove what hour the moon rose on August 9 of that year. In *Piper v. Voorhees,* 155 A. 556 (Me. 1931), the "*History of Scarborough,*" produced by the Maine Historical Society, was admitted without extrinsic evidence of authenticity to prove remote facts of general history.

as its witness to impeach the accused's credibility. Nothing in *Beckette* suggests that the waiver of the privilege cannot be, as here, in a publication written by the client. In other words, what the client chooses to tell the world, he cannot later prevent his attorney from telling the court.[28]

Appellant next contends that Mr. White's testimony went beyond the scope permitted by Judge Williams when he granted the State's motion to compel and ordered Mr. White to answer all questions "with respect to his communications with Spiro T. Agnew dealing with campaign contributions and alleged kickbacks, and, thus, with that subject which is the focus of [this] case." Specifically, appellant urges, Mr. White should not have been permitted to refer to conversations with Mr. Hammerman and Mr. Matz. However, Judge Williams' order was broad, and properly so, because it had to encompass the subject matter at issue. Both Mr. Hammerman and Mr. Matz were greatly involved in the subject matter at issue. Thus, we reject this contention.

## VII

A plea of *nolo contendere* is, of course, an admission of guilt which can subject the defendant to the same punishment as on a plea of guilty. Md. Rule 731 d. (1982 ed.); *see also* Rule 723 (1977 Repl. Vol.); Rule 731 d. (1981 Cum.Supp.). Maryland law concerning the use of this plea in a subsequent proceeding is scant. *See generally, McCall v. State,* 9 Md. App. 191, n.4 at 193, 263 A.2d 19 (1970), *cert. denied,* 258 Md. 729 (1970); *Comment, The Plea of Nolo Contendere,* 25 Md.L.Rev. 227, 233 (1965). By specific rule,

---

**28.** Generally, a disclosure by a client to an outside person of conversations covered by the attorney-client privilege waives that privilege as to the portions disclosed. *See, e.g.,* United States v. Cochran, 546 F.2d 27 (5th Cir. 1977) (attorney who testifies on matters of public record does not violate attorney-client privilege); In re Horowitz, 482 F.2d 72 (2d Cir. 1973), *cert. denied,* 414 U.S. 867 (1973) (confidentiality of communications between lawyer and client ends when client's files are open to others' inspection). As Professor McCormick notes, regarding the idea of "once published, permanently waived": "Authority is scanty, but it seems that if the client makes public disclosure, this should clearly be a waiver . . . ." *McCormick on Evidence* § 93 at 197 (2d ed. 1972).

a *nolo contendere* plea is admissible in disciplinary proceedings affecting attorneys. Md. Rule BV10 e. Indeed, in *Maryland State Bar Association v. Agnew, supra,* Mr. Agnew did not question that, under this rule, the final judgment in the United States District Court following the *nolo contendere* plea was conclusive proof of his guilt of the crime charged. 271 Md. at 548. *Contra, In re Corcoran,* 337 P.2d 307 (Ore. 1959).

Under the Federal Rules of Evidence, pleas of *nolo contendere* and accompanying statements are "not admissible in any civil or criminal proceeding against the person who made the plea. . . ." Fed. Rule 410. *See also* Federal Rules of Criminal Procedure, Rule 11(e)(6); *Neuner v. Clinkenbeard,* 466 F.Supp. 54 (W.D.Okla. 1978).

In the absence of a Maryland rule of evidence or procedure, the common-law approach to the question of the effect of the plea is articulated in *Mickler v. Fahs,* 243 F.2d 515, 517 (5th Cir. 1957): "It is not receivable in another proceeding as evidence of guilt." *See Piassick v. United States,* 253 F.2d 658 (5th Cir. 1958); *A.B. Dick Co. v. Marr,* 95 F.Supp. 83 (S.D.N.Y. 1950), *cert. denied,* 344 U.S. 878 (1952).

The rationale for the rule is that the plea establishes the fact of guilt only in the case to which it applies. *United States v. Reisfeld,* 188 F.Supp. 631 (D.Md. 1960). Unlike a guilty plea, *nolo contendere* has no effect beyond the case in which it is entered. *See Annot., Plea of Nolo Contendere,* 89 ALR2d § 37-50 at 600 (1963). Thus, the plea subsequently "does not estop the defendant to plead and prove his innocence in a civil action." *Hudson v. United States,* 272 U.S. 451, 455 (1926); *Reisfeld, supra.*

As previously indicated, the entire transcript of the proceedings before U.S. District Judge Hoffman, *United States v. Agnew, supra,* was admitted into evidence along with the criminal information, the plea, the sentence, and a 40-page "exposition of the evidence," prepared by the government. The trial court ruled that the plea and transcript were admissible as an admission of a party opponent. However, all Mr. Agnew admitted was income tax evasion. And that

admission was to fulfill his agreement with the prosecutors, not as appellee suggests, to have "the last word."

At all events, we subscribe to the majority view that a statement made at the time of entering a *nolo* plea and the plea itself are not admissible against a party in a subsequent civil proceeding. We do not find *Peisner v. State,* 236 Md. 137, 202 A.2d 585 (1964), *cert. denied,* 379 U.S. 1001 (1965), upon which the appellee relies, persuasive authority that Mr. Agnew waived his objection to the *nolo* plea's admission by introducing a letter from the State Comptroller of the Treasury, dated August 16, 1974, which referred to the plea. The latter merely spelled out state tax adjustments and was put in evidence to mitigate the damages sought by the plaintiffs.

However, because the trial judge relied primarily on the testimony and the sworn declarations against interest properly admitted, which "form the basis of the whole action," admission of the *nolo* plea and the transcript was not reversible error. *See Tully v. Dasher,* 250 Md. 424, 244 A.2d 207 (1968); *Lawrence v. Kozlowski,* 372 A.2d 110 (Conn. 1976), *cert. denied,* 431 U.S. 969 (1977), *See also* 2 *Weinstein's Evidence* § 410 [06] (1981).

## VIII

On the last day of trial, the State submitted a memorandum outlining its entitlement to prejudgment interest. Attached to the memorandum was a worksheet, dated April 8, 1981, showing the amounts and dates of payments to Mr. Agnew and interest at six percent, aggregating the sum of $101,235.

In his oral decision, Judge Williams addressed this subject in part as follows:

"The State has further made requests for interest on these sums, and admits that this, of course, is within the discretion of the court. I think that in this instance it's clear that Mr. Agnew received

these sums at varying times and over a period of several years, that each of these sums has been used by him and for one purpose or another, he's had the use of this money. This money belongs to the State of Maryland, to the people of the State of Maryland, and the people of the State of Maryland are entitled to have interest for Mr. Agnew's use of this money.

I think the measure of the interest claimed is inherently reasonable. There is only a claim for six percent interest, and the computation that's been offered to the court as part of the memorandum filed today would indicate that, as I have reviewed it, each of these interest calculations is from the time of receipt of the particular funds by Mr. Agnew, and where there's a question it's been the latter — the latest date in time from which interest has been computed. So that the interest claimed by the State is found to be reasonable and just."

The award of prejudgment interest is generally left to the discretion of the trial judge, *Dialist Co. v. Pulford,* 42 Md. App. 173, 399 A.2d 1374 (1979); *Charles County Broadcasting Co., Inc. v. Meares,* 270 Md. 321, 332, 311 A.2d 27 (1973). However, in some cases where the money claimed has actually been used by the other party, *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.,* 262 Md. 192, 235, 278 A.2d 12 (1971), *cert. denied,* 404 U.S. 857 (1971), interest may be recovered as a matter of right, *Kasten Construction Co. v. Anne Arundel County,* 262 Md. 482, 490, 278 A.2d 282 (1971). The exercise of discretion to award prejudgment interest must be based on the "equity and justice appearing between the parties and a consideration of all the circumstances. . . ." *I.W. Berman Properties v. Porter Brothers, Inc.,* 276 Md. 1, 21, 344 A.2d 65 (1975).[29]

---

**29.** The appellant has not raised any issue as to post-judgment interest which is automatic in this State. Md. Rule 642. However, we point out that allowance of interest on the unpaid interest amounts to compound interest on a judgment and is not permitted in this State. Walker v. Acting Director, Department of Forests and Parks, 284 Md. 357, 367, 396 A.2d 262 (1979).

Appellant argues that equity should not permit prejudgment interest here because the State treated the funds received as unearned income and Mr. Agnew paid a total of $14,105 in income tax, interest, and penalty. Should the State be allowed to require the appellant to pay interest on the money it previously assessed for taxes? Can equity tolerate such a result, the appellant asks?

These questions have been asked and answered before. As pointed out in *United States v. St. Pierre*, 377 F.Supp. 1063, 1064 (S.D.Fla. 1974), *aff'd*, 510 F.2d 383 (5th Cir. 1975):

"Whenever a person receives money as his own, it is income for federal tax purposes. (Citation omitted.) Merely paying the applicable federal income tax does not relieve the taxpayer of conflicting ownership claims of third persons. If those claims are proved correct and the money is refunded, then the taxpayer will be entitled to a deduction."

The court there held that the government's suit to recover gratuities received by the defendant while working as a Federal Housing Administration appraiser, was not inconsistent with its previous action against the defendant for tax evasion. *Id.* at 1064-5. *See also Caldwell v. Commissioner*, 135 F.2d 488 (5th Cir. 1943); *United States v. Drisko*, 303 F.Supp. 858 (E.D.Va. 1969).

Similarly, payment of state taxes on income does not establish a right to that income. A third party, or in this case, the State, may prove its claim to the income and recover the amount claimed. The taxpayer's subsequent remedy is through the tax system — by claiming a deduction in the year of repayment. *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932). *Compare, St. Pierre, supra,* with *Spitz v. United States*, 432 F.Supp. 148 (E.D.Wis. 1977) (the taxpayer may deduct restitution payments) and *Rappaport v. United States*, 583 F.2d 298 (7th Cir. 1978) (taxpayer challenging assessment for embezzled funds free to pay tax and sue for refund).

We observe that neither in final argument to the court below nor in any opposing memorandum, did appellant object to prejudgment interest. His contention in his brief, that appellee's collection of back taxes "disentitled" the State to interest from "the date of the assessment of tax" in 1974, is made for the first time. We think this claim is without merit, and no abuse of discretion on the part of the trial judge has been shown.

## IX

We shall consider in this section the remainder of appellant's assignments of error.

### 1. *Intervention.*

The State's motion for leave to intervene under Md. Rule 208(a) became necessary when the trial court denied, on June 19, 1980, the taxpayers' motion for summary judgment solely on the ground that they had failed to show special damages. This ruling telegraphed a message that the standing of the three individual taxpayers was in doubt. It was clear that representation of the state's interests by the taxpayers might be "inadequate." *Citizens Coordinating Committee on Friendship Heights, Inc. v. TKU Associates,* 276 Md. 705, 713, 351 A.2d 133 (1976). The State had a right to protect its interest and was properly permitted to do so.[30] *Maryland-National Capital Park and Planning Commission*

---

**30.** Appellant urges that the State cannot intervene because it is not a person under Md. Rule 208(a) as defined by Md. Rule 5(q). This contention was not raised below and thus is not before this Court. Md. Rule 1085. In any event, *Maryland-National Capital Park and Planning Commission v. Washington National Arena,* 30 Md. App. 712, 354 A.2d 459 (1976), held that the State may intervene as a matter of right when its representation "may be inadequate." *Id.* 717. *See also* Department of State Planning v. Mayor of Hagerstown, 288 Md. 9, 415 A.2d 296 (1980). Appellant's timeliness argument overlooks the fact that timeliness relates to the "readiness of the case for trial" more than the time since the suit was filed. Alexander v. Hall, 64 F.R.D. 152, 157 (D.S.C. 1974). Appellant here showed no prejudice resulting from postponement of the original trial date on October 27, 1980, to April 1981. In fact, neither the State nor the appellant sought continuance because of the State's intervention. The continuance was granted at the request of Mr. Hammerman.

*v. Washington National Arena,* 30 Md. App. 712, 354 A.2d 459 (1976). The four familiar criteria for resolving the question of timeliness, *Maryland Radiological Society, Inc. v. Health Services Cost Review Commission,* 285 Md. 383, 402 A.2d 907 (1979), were plainly satisfied, and no prejudice was shown.

## 2. *Due Process.*

Appellant complains that the judgment was outside the cause of action stated in the Bill of Complaint and that he was denied due process. This action was based on constructive trust, accounting, and breach of fiduciary duty. The State never attempted to litigate any other points of law or fact new to the case; nor did it refuse to be bound by prior rulings of the trial court. Therefore, the State correctly stood in the shoes of the original plaintiff, *Conroy v. Southern Maryland Agricultural Association,* 165 Md. 494, 169 A. 802 (1934), and showed a breach of fiduciary duty by the appellant and the amount of money he gained from that breach. *See Kerpelman v. Board of Public Works,* 261 Md. 436, 445, 276 A.2d 56 (1971), *cert. denied,* 404 U.S. 858 (1971); *United States v. Mandel,* 415 F.Supp. 997, 1009 (D.Md. 1976), 591 F.2d 1347, *aff'd, by an equally divided court,* 602 F.2d 653 (4th Cir. 1979). Further, the appellant demonstrated no violation of due process based on lack of notice or opportunity to be heard. The "inherent nature of the litigation ... vigorously defended by appellant for over [*sic*] four years" remained the same.

## 3. *Estoppel.*

Contrary to appellant's contention, neither the State's refusal to take earlier action against Mr. Agnew nor its acceptance in 1974 of payment of back taxes in the sum of $14,105 for the years 1967-72 in any way constitutes an estoppel. It is well settled that the doctrine of estoppel will not be applied against the State in the performance of its governmental, public, or enforcement capacity. *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 63, 300 A.2d 367 (1973). Even if estoppel were applicable

against the State, the evidence in this case falls far short of demonstrating the applicability of the doctrine. *See Chertkof v. Philadelphia, Baltimore & Washington Ry. Co.,* 254 Md. 557, 255 A.2d 14 (1969).

### 4. *Burden of Proof.*

Appellant raises the question of whether the State's burden of proof was satisfied by a "clear and convincing showing" of a fiduciary relationship, and a breach of duty inherent therein by the receipt of money by the fiduciary. Alternatively, appellant inquires, did the State as an intervenor in a taxpayers' class suit remain "subject to the law of taxpayers' actions generally and the law of the subject case, particularly, developed over a period of four years?

We must reject out of hand the suggestion that the State, like the individual taxpayers, should have been required to prove "special damages." The latter was, according to the trial court, the burden of the individual plaintiffs. We think it absurd, however, to maintain that the State was similarly bound. The cases are legion for the proposition that the State need not show any special damages to recover the profits made from a breach of trust by one of its officers, beginning with *United States v. Carter,* 217 U.S. 286 (1910). In *Carter,* the Supreme Court dismissed such an argument, saying:

> "It is immaterial ... whether the complainant [United States] was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any actual loss by fraud or otherwise. . . . It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent [a military officer] may hold on to any secret benefit he may be able to make out of his agency."

*Id.* at 305-6.

*See also County of Cook v. Barrett,* 344 N.E.2d 540, 548 (Ill. App. 3d 1975).

As for the "clear and convincing" standard of proof, which appellant claims is applicable in this equity suit, we are satisfied that even if he were correct, the evidence amply supports the trial judge's findings.[31] Md Rule 1086.

### 5. *Denial of Fair Trial.*

The "totality of the lower court's procedural and evidentiary rulings" calls for commendation, not reversal because of cumulative error, as the appellant claims. Appellant says in his brief that he recognizes that the old adage, "always a bridesmaid, never a bride," aptly describes the plight of those who have sought reversal on the ground of cumulative error. He urges us to "consummate the ceremony," but appellant here is no closer to the altar, and we decline his invitation.

## X

We come finally to the taxpayers' cross-appeal, which requires only a brief discussion. Their appeal seeks to chal-

---

**31.** The transcript reveals the following testimony by Mr. White, Mr. Agnew's former attorney:

"Q   Mr. White, what did Spiro Agnew say to you?

Mr. Harrison: Objection.

Court: Overruled.

Mr. White: I would like Your Honor to order me to answer this question.

Court: You are being ordered to answer it.

A   I said something first.

Q   What did you say?

A   I said, "Ted, this is terribly serious. You've got to level with me. I've got to know.' His answer was, *'It's been going on for a thousand years. What Jerry and Bud told you is true. Matz is grossly exaggerating the amount of money involved. They only gave me twenty-five hundred dollars.'* " (Emphasis added.)

lenge the action of the lower court in dismissing them as party plaintiffs because they had not shown "special damages." The relief prayed in the original Bill of Complaint, adopted by the State upon intervention, was granted, and the judgment of the lower court will be affirmed. Accordingly, the issue presented by the taxpayers' cross-appeal is moot. *See generally James v. Anderson,* 281 Md. 137, 377 A.2d 865 (1977); *Citizens Planning and Housing Association v. County Executive of Baltimore County,* 273 Md. 333, 329 A.2d 681 (1974); *State v. Ficker,* 266 Md. 500, 295 A.2d 231 (1972); *Lloyd v. Supervisors of Elections,* 206 Md. 36, 111 A.2d 379 (1954).

> *Judgment affirmed; cross-appeal dismissed; cross-appellants to pay their own costs; appellant to pay all other costs.*